Suketu H. NANAVATI, M.D., Appellant in 86–5778,

v.

BURDETTE TOMLIN MEMORIAL HOSPITAL, and Executive Committee of the Medical Staff of Burdette Tomlin Memorial Hospital and Robert J. Sorensen, Appellants in 86–5819.

Robert J. SORENSEN, M.D.

v.

Suketu H. NANAVATI, M.D.

Nos. 86–5778, 86–5819.

United States Court of Appeals, Third Circuit.

Argued July 13, 1987.

Decided Aug. 24, 1988.

Petitions for Panel Rehearing and Suggestion for Rehearing In Banc Denied Sept. 26, 1988.

David H. Weinstein (argued), William B. Lytton, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., for appellant Suketu H. Nanavati, M.D.

F. Emmett Fitzpatrick, III (argued), F. Emmett Fitzpatrick, Philadelphia, Pa., for appellee Robert J. Sorensen, M.D.

Nina Wisznat Chase (argued), Carl J. Valore, Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz, P.C., Northfield, N.J., Robert E. Paarz (argued), William M. Honan, Horn, Kaplan, Goldberg, Gorny & Daniels, Atlantic City, N.J., for appellees Burdette Tomlin Memorial Hosp.

Before HIGGINBOTHAM, BECKER and HUNTER, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

## I. INTRODUCTION

This case arises out of a bitter and quite public personal feud between Suketu H. Nanavati, M.D., and Robert J. Sorensen, M.D., two physicians at Burdette Tomlin Memorial Hospital ("the Hospital"), a small Cape May Court House, New Jersey hospital. The feud has spawned two actions with numerous claims: (1) federal antitrust claims (each has sued the other on an antitrust theory); (2) reciprocal slander suits involving the hospital as well as the physicians; (3) race discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, and under 42 U.S.C. § 1981 (Dr. Nanavati is an American citizen born in India); and (4) reciprocal tortious interference with business claims. The litigation has raged in state as well as federal courts, trial and appellate, and has presented an extraordinary number of difficult legal issues in the fields of procedure, judgments, defamation, and antitrust. The jury, following a lengthy trial, left the opposing parties, whom it apparently thought "deserved each other," in a virtual wash: it awarded Dr. Nanavati a substantial antitrust verdict against the hospital which, when trebled, was almost equivalent to the substantial defamation and tortious business interference verdicts it awarded Dr. Sorensen. However, the district court set aside the antitrust award by a judgment n.o.v., and these cross-appeals followed.

The procedural history of the case is extraordinarily complex, and problems of subject matter jurisdiction flowed from the odd manner in which the case was pleaded.

Technically, the parties brought two separate consolidated actions, and arguably the viability of certain pendent state claims in one action depended upon their relationship to federal claims in the *other* action. However, any putative jurisdictional problems were solved by the healing effect of Fed.R. Civ.P. 15(b) under which pleadings may be deemed amended to conform to proof. Given the liberal construction of Rule 15(b) and our assessment that all parties treated the consolidated actions as one unified action, we shall do the same. We therefore conclude that we have jurisdiction.

Turning to the defamation claim (and tortious interference claims, which have no independent basis and stand or fall with the defamation claims), we conclude that the award in Dr. Sorensen's favor cannot stand. First, we hold that four of the five allegedly slanderous statements made by Nanavati were protected statements of opinion. This conclusion follows from the fact that these statements were made to newspaper reporters (it is the publication to the reporters and not the republication in the newspapers that is in issue) who were fully conversant with the facts on which they were based, and who understood that Nanavati was presenting his own opinion on the question of the quality of medical care. Even outrageous statements of opinion are protected, and we will set aside the award in Dr. Sorensen's favor. Furthermore, we hold that the fifth statement, which was made to a hospital technician, who did not believe it and who passed it on to her superior solely for the purpose of protesting such scandalous remarks would not be recognized by New Jersey as inflicting sufficient injury to sustain an action for slander.

However, we will affirm the judgment n.o.v. on the antitrust claim. We must reach the antitrust claim because we hold that the plaintiff's antitrust and discrimination claims are not, as defendants contend, barred under the principles of res judicata by a state court judgment ordering Dr. Nanavati's hospital staff privileges restored. We will affirm because we conclude that only the Executive Committee's

revocation recommendation meets the contract, combination or conspiracy requirement of § 1, and that Nanavati failed to present evidence of damages for the five-day period during which the revocation decision excluded Nanavati from the Hospital.

Referring first to the jury's findings, the jury rejected the two principal premises of Nanavati's case, first by exonerating Sorensen, the alleged mastermind of the conspiracy and Nanavati's sole competitor in Cape May County, from any complicity; and second by concluding that Nanavati's expulsion from the Hospital staff was due to his unprofessional conduct (inability to get along with hospital staff, etc.). In legal terms, we conclude that: (1) Nanavati has presented no viable theory that would render the Hospital a co-conspirator, particularly in view of our decision in *Weiss v. York Hospital*, 745 F.2d 786 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); and (2) given that his staff privileges were reinstated by a state court injunction within five days of his ouster, Nanavati simply failed to present evidence of damages resulting from the recommendation by the Executive Committee (the sole remaining antitrust defendant) to revoke his staff privileges.

## II. BACKGROUND FACTS AND PROCEDURAL OVERVIEW

Dr. Nanavati was born and reared in India and came to the United States in 1970 to continue his medical education. He became board certified in cardiology in 1977. After serving in a hospital in DuBois, Pennsylvania, he received medical privileges at Burdette Tomlin Memorial Hospital in Cape May Court House, New Jersey, moved to Cape May in 1979, and continued his practice there. At the time he arrived at the Hospital, its chief (and sole) cardiologist was Dr. Sorensen. Dr. Sorensen was board certified in internal medicine though not in cardiology.

As the Hospital's chief cardiologist, Sorensen had exclusive control over allocating electrocardiograms ("EKG"s), which were a substantial source of revenue. Soon af-

ter arriving at the Hospital, Nanavati demanded to share in these EKG readings, but was unsuccessful. Nanavati thereupon sought assistance from the Executive Committee of the medical staff. Then, only three weeks after his arrival, Nanavati launched a verbal attack upon Sorensen at a staff meeting, demanding to know why an "inferior[ly] qualified" physician should control the EKG readings. J.A. at 5159.

Nanavati was allocated EKG readings several days per week, but he remained unsatisfied. He proceeded to make internal complaints about Sorensen's handling of patient care and to demand more EKG readings. Eventually Nanavati made public his complaints about the quality of patient care at the Hospital. In his most serious accusation, he stated that Sorensen's incorrect reading of EKGs had led to the death of at least one patient. Nanavati also engaged in numerous quarrels with nursing personnel and members of the medical staff, arousing the ire of members of the staff by allegedly stealing patients, overbilling and prescribing unnecessary treatments.

Nanavati's comments touched off insulting comments by Sorensen. To the hospital staff, he referred to Nanavati, who is dark-skinned, as a "nigger," J.A. at 4029, and as "the Indian." J.A. at 4013. To the press, he accused Nanavati of being arrogant, backbiting and "nasty." J.A. at 3114. In addition, Sorensen resisted orders from the Executive Committee that he provide Nanavati with more days to read EKGs. The struggle between Nanavati and Sorensen not only became a cause celebre in the local newspapers but also received publicity in the Philadelphia Inquirer.

As we have intimated, a colossal legal struggle, both in the Hospital and outside, followed these verbal battles. In June of 1982, Nanavati filed a charge against the Hospital with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination because of national origin. In August of that year, charges were filed with the Executive Committee seeking Nanavati's dismissal from the staff. The Ex-

ecutive Committee, comprised of several members of the medical staff, was empowered under the Hospital's medical staff constitution and by-laws to make staff privileges recommendations to the Hospital Board of Governors. In September 1982, Nanavati filed a second charge with the EEOC against the Hospital, this time alleging unlawful retaliation.

On November 12, 1982, after evidentiary hearings at which Nanavati was unrepresented by counsel, the Hospital Board of Governors terminated Nanavati's staff privileges for violation of hospital bylaws.[1] On November 17, 1982, Nanavati filed a complaint in New Jersey Superior Court, Chancery Division, which promptly issued a temporary restraining order reinstating Nanavati to the staff, on the ground that the Hospital had failed to follow its own bylaw procedures in terminating him. On April 15, 1983, the Board of Governors' Hearing Committee, appointed for the occasion in the wake of the court decision, recommended that the November 12 termination of Nanavati's staff privileges be affirmed. As part of its report on Nanavati, the Hospital compiled a "Black Book," which included numerous reports, letters and testimony on issues arising from the dispute between Nanavati and the Hospital staff. The Hospital released the Black Book to the press. In July 1983, the New Jersey court denied the Hospital's application to dissolve the restraining order, found that the Hospital had held *ex parte* hearings that "violated fundamental fairness," and entered an order remanding the case to the Hospital Board of Governors for fur-

ther proceedings in which Nanavati could have the assistance of counsel.

The Hearing Committee conducted new hearings on July 15 and August 5, 1983. On October 21, 1983, the Hearing Committee again recommended termination of staff privileges and the full Hospital board approved that recommendation. The litigation then resumed in state court with another motion by the Hospital to vacate the injunction against dismissal. Nanavati charged that the Hospital's new decision also was procedurally invalid because the Board was biased. After discovery and a hearing, the Superior Court again held for Nanavati. J.A. at 2485. The court concluded that the Board had been biased and that the hearing "was a nullity from beginning to end." *Id.* at 2502. It therefore refused to accord the Board's decision any deference, and proceeded to determine the merits of the Nanavati exclusion de novo.

The court found that Nanavati had indeed been disruptive at the Hospital. But it held that state law permitted termination of hospital privileges only if the disruption had an actual, negative impact on patient care. Under that standard, the court found dismissal from the staff inappropriate. It therefore entered an order permanently enjoining Nanavati's dismissal on the misconduct charges at issue. The order eventually was appealed to the New Jersey Supreme Court, which, although finding a great need for deference to the decisions of hospital administrators, affirmed.[2]

In addition to these state court and Hospital Board proceedings, Nanavati initiated

---

1. The bylaw provision in question requires a staff doctor to:
 be of a temperament and disposition that will enable him to work in harmony with his colleagues on the Medical Staff; with the professional, technical, and other personnel in the hospital, and with the administration, accepting criticism without resentment and offering it in a spirit and manner that is constructive and devoid of offense and malice. . . .
 J.A. at 3010.

2. The Supreme Court modified the Superior Court's statement of the applicable rule, holding that it is unnecessary for disruption to cause actual harm to patients, and that conduct that

" 'will probably have an adverse effect on patient care' " was required to uphold a termination. *Nanavati v. Burdette Tomlin Mem. Hosp.*, 107 N.J. 240, 526 A.2d 697, 704 (1987) (quoting *Sussman v. Overlook Hosp. Ass'n*, 92 N.J.Super. 163, 182, 222 A.2d 530 (Ch.Div.1966) *aff'd*, 95 N.J.Super. 418, 231 A.2d 389 (App.Div. 1967)). Moreover, because of turnover of the Board of Governors' membership since the time of Nanavati's initial staff privileges revocation, the court decided that the Hospital should have one more chance to decide the matter impartially. Modifying the trial court's order in this one respect, the Supreme Court affirmed. However, the record does not reveal any additional action by the Hospital.

federal court proceedings, filing a complaint on March 8, 1983 in the district court for the District of New Jersey. In this complaint, No. 83–0794, Nanavati pleaded several claims. First, he pleaded discrimination claims against the Hospital under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17. The parties dispute whether the complaint also asserted these claims against Sorensen. In a separate count, Nanavati asserted state tort claims of defamation and tortious interference with business relations against Sorensen.

On May 10, 1984 Sorensen filed a federal court complaint against Nanavati, and the district court consolidated the two actions. This complaint, No. 84–1790, also included several claims for alleged antitrust violations, for slander, and for malicious interference with business relations. Nanavati thereupon counterclaimed, pleading similar claims against Sorensen. At trial, Nanavati amended his antitrust complaint to include the Hospital and the Executive Committee of the medical staff as defendants on the antitrust claim.

During pretrial proceedings, the district court granted partial summary judgment for Nanavati, dismissing Sorensen's antitrust claims and some of Sorensen's defamation claims. At the final pretrial conference, Nanavati withdrew his own defamation claims. During trial, the court dismissed Nanavati's Title VII claims on the ground that Nanavati, as a physician, was an independent contractor, not an employee covered by the Act. The surviving claims went to the jury in the form of a special verdict with questions labelled "special interrogatories" by the district court. See Fed.R.Civ.P. 49(a). The jury returned the following verdicts:

(1) in favor of the Hospital and the Executive Committee on Nanavati's § 1981 discrimination claim;

(2) in favor of Nanavati on his antitrust claims against the Hospital and the Executive Committee, but against him on his antitrust claim against Sorensen;

(3) in favor of the Hospital on the Hospital's defamation claim against Nanavati; damages were fixed in the amounts of $100,000 compensatory and $50,000 punitive damages;

(4) in favor of Sorensen on Sorensen's defamation claims against Nanavati; damages were fixed in the amounts of $100,000 compensatory and $500,000 punitive damages;

(5) in favor of Sorensen on Sorensen's tortious business interference claim against Nanavati; damages were fixed in the amounts of $100,000 compensatory and $300,000 punitive damages; and

(6) in favor of Sorensen on Nanavati's tortious interference with business claim. The total damage verdicts were thus $1,050,000 in Nanavati's favor and $1,150,000 against him. Of the damages against him, $1,000,000 were in favor of Sorensen and $150,000 were in favor of the Hospital. On motions for judgment notwithstanding the verdict, the district court set aside Nanavati's antitrust award. However, it upheld the defamation and business interference verdicts for the Hospital, the Committee, and Sorensen. These cross-appeals followed.

Nanavati appeals: 1) the denial of Nanavati's motion for judgment n.o.v. on Sorensen's defamation and tortious interference with business relations verdict; 2) the denial of Nanavati's motion for new trial on his § 1981 claim against the Hospital; 3) the denial of Nanavati's motion for new trial on his tortious interference claim against Sorensen; and, 4) the grant of the judgment n.o.v. in favor of the Hospital and the Executive Committee on Nanavati's antitrust claims. The Hospital, Executive Committee and Sorensen filed a cross-appeal, No. 86–5819. Because they are completely satisfied with the final judgment and object only to interlocutory rulings of the district court, we lack jurisdiction over their appeal. *Dalle–Tezze v. Director, OWCP*, 814 F.2d 129 (3d Cir.1987). However, we have treated the issues raised in the cross-appeal as alternative grounds for affirmance of the district court's judgment.

## III. THE SLANDER CLAIMS

### A. *The Allegations*

Sorensen and the Hospital received jury verdicts for slander based on Nanavati's remarks to the press and to an EKG technician, Anne O'Neil. Sorensen relied upon five such statements at trial. Four of the statements stemmed from press interviews referring to a 1981 incident in which a patient, Elsie Steinmeyer, died from an ailment that had been diagnosed incorrectly. The fifth statement stemmed from Nanavati's 1985 conversation with O'Neil.

Several doctors read Mrs. Steinmeyer's EKG, including both Sorensen and Nanavati. The original EKG apparently were difficult to read and had suggested to all the doctors, except Nanavati, that Mrs. Steinmeyer suffered from a myocardial infarction. This was the more common and therefore the more "conservative" interpretation. Nanavati alone read the EKG as suggesting that the patient suffered from a pulmonary embolism, although he was not certain. Nanavati was the consulting physician, and was on call at the time she died. Despite his diagnosis, however, he had not prescribed treatment for a pulmonary embolism, and was criticized in a subsequent medical investigation of the whole affair, published in the Hospital's Black Book, for failing to press his diagnosis.

A third doctor, Mrs. Steinmeyer's treating physician, was primarily responsible for her care, and made the choice to follow the "conservative" interpretation. Sorensen's only involvement with the patient was his reading of one of her early EKG. An autopsy after Mrs. Steinmeyer's death revealed that the cause of her death had indeed been a pulmonary embolism. In a later independent review of the EKG, Dr. Meister, a cardiological expert, concluded that Sorensen in no way had been negligent in reading the EKG. The Meister report appeared in the Hospital's Black Book.

The following specific statements, made by Nanavati to a reporter inquiring about Dr. Meister's support of Sorensen's reading of the EKG, are at issue in Hospital's and Sorensen's slander claims against Dr. Nanavati:

1. "The conservative interpretation probably cost the patient her life."
2. "The correct interpretation [of the EKGs] would have saved her life because a pulmonary embolism is fully treatable if it is diagnosed and quickly handled."
3. "How can Dr. Meister be right when the patient is dead?"

Moreover, referring generally to the entire incident, Nanavati stated:

4. "I was concerned about everyone's life after that, I saw that man [the patient's husband] and I had to cover up for this doctor [Sorensen]."
5. "I never knew medicine could be so shallow."

O'Neil testified at trial that Nanavati, in 1985, in a private conversation between the two, had referred to Sorensen as a

[6.] "senile old doctor that had been there [at the Hospital] for twenty years killing patients."

The Hospital also sued Nanavati for slander, citing two statements made by Nanavati to the reporters in its slander claim. The defamation claim made by the Hospital against Nanavati relied in part on statement # 1 (the "conservative interpretation" statement) and statement # 5 (the "shallow medicine" statement).

As a result of Nanavati's allegedly slanderous remarks, an article appeared in the Atlantic City Sun on May 11, 1983. However, Sorensen and the Hospital sued for slander only, basing their claims on what was said to the reporters and not for libel based on the published report.

### B. *Jurisdiction*

The procedural history of the defamation claims is complex. Technically, the case is comprised of two separate consolidated actions.[3] *See supra* page 99. Although

3. Fed.R.Civ.P. 42 provides in relevant part:
 (a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consol-

consolidation was perfectly appropriate here, we note that few of the formal requirements of maintaining two separate actions were observed by the parties. As a general rule, consolidation is a procedural device, not a means for joining new parties or claims to old actions. It does not serve the purpose of circumventing the established procedures for amending complaints or joining new parties. *See Cole v. Schenley Industries*, 563 F.2d 35 (2d Cir.1977). However, it is apparent that all parties and the district court did indeed treat the consolidated cases as one large case.[4]

In the interests of fairness and efficiency, given the uncontested treatment in the district court, we likewise consider this case as a unified action. *See* Fed.R.Civ. Pro. 1 (rules of procedure "shall be construed to secure the just, speedy, and inexpensive determination of every action"). We therefore will construe Fed.R.Civ.P. 15(b), which allows for amendment of pleadings to conform to the evidence, quite broadly and conform the pleadings of Civil Action No. 83–0794 (Nanavati's initial suit against Sorensen, the Executive Committee and the Hospital) to reflect the nature of the action and proofs. Given our determination *infra* that the district court possessed the power to have tried this case as a single action, and that at least for juris-

dictional purposes the parties treated it as such, liberal treatment seems appropriate. *See In Re Meyertech Corp.*, 831 F.2d 410, 422–23 (3d Cir.1987) (treating issue tried by consent, squarely presented and foisting no surprise on any party, as included in constructively amended complaint even though no technical amendment was ever made); 6 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1494 (1971); *cf. Schultz v. Cally*, 528 F.2d 470, 474–75 (3d Cir.1975) (refusing to apply Rule 15(b) to constructively amend pleadings where doubt existed as to whether defendants would have agreed to the existence of federal question jurisdiction and where case was tried in district court under a mistaken theory of diversity).

 Nanavati contends that the district court lacked subject matter jurisdiction over Sorensen's slander claim. He argues that because the state claims were not properly connected to any federal claim in the action and because all the parties are residents of New Jersey, federal jurisdiction is lacking.[5] Given our willingness to consider the actions below as constructively amended, we find no jurisdictional defect.[6] We hold that Sorensen's defamation claims were properly pendent and ancillary to federal claims in the action.[7]

---

idated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

4. Perhaps the best evidence of this tendency to accrete the two separate actions is Nanavati's attempt, once the trial was already underway, to join the Hospital and Executive Committee as defendants to the antitrust claim. Although the Hospital and the Executive Committee protested on the grounds of prejudice (*see infra* n. 19 for a discussion of the last minute addition of these defendants to the antitrust claim), no one complained that the Hospital was not even a party to the second suit in which the antitrust claim was presented.

5. We note that in the district court, Nanavati advocated just the opposite, claiming that the existence of subject matter jurisdiction existed over all the state claims. *See* J.A. at 159–161. Nanavati's strategy, however, is of no consequence given our mandate to determine independently our own subject matter jurisdiction. *See Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541–42, 106 S.Ct. 1326, 1331–32, 89

L.Ed.2d 501 (1986); *Lovell Mfg. v. Export Import Bank of the United States,* 843 F.2d 725, 729 (3d Cir.1988).

6. We note that this disposition obviates the need to address the many intricate and tantalizing procedural questions (including the recognition of pendent party jurisdiction) presented by Nanavati's clever attempts at this late stage to revivify the separate natures of the two actions.

7. Pendent jurisdiction allows the plaintiff to append related state claims to his federal causes of action. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Ancillary jurisdiction typically involves a claim other than that of the plaintiff, such as a claim by a defending party or another whose rights are in jeopardy. *See Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). Although many courts and scholars question whether there is in truth any real distinction between ancillary and pendent jurisdiction (the Supreme Court specifically avoided answering this question in *Owen*) the functional difference stems

In *Ambromovage v. United Mine Workers of America,* 726 F.2d 972, 989–91 (3d Cir.1984), this court set out a tripartite test by which such supplemental (ancillary and pendent) jurisdiction should be judged. First, pursuant to *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed. 2d 218 (1966), the court must possess constitutional power to hear the claim. Second, the extension of jurisdiction cannot contravene or undermine federal statutory law. Third, the court must examine whether, in the exercise of its appropriate discretion, the claim is of the type to which supplemental jurisdiction should be extended. *Ambromovage,* 726 F.2d at 989–91.[8]

■ Our inquiry here revolves solely around the first prong of the test. The question of power is constitutional, governed by the limitations of Article III. To satisfy the constitutional prong of the test, we must determine whether a substantial federal claim is present and whether the state and federal claims derive "from a common nucleus of operative fact" such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138.

In trying to set out standards for supplemental jurisdiction and to apply them consistently, we observe that, like unhappy families, no two cases of supplemental jurisdiction are exactly alike. The principle that we glean from the cases is that mere tangential overlap of facts is insufficient, but total congruity between the operative facts of the two cases is unnecessary.[9] *See Skevofilax v. Quigley,* 810 F.2d 378, 385 (3d Cir.) (in banc) (district court has ancillary jurisdiction over a cross-claim for garnishment by a judgment creditor against a

nonparty to the original lawsuit, where the non-party may owe the judgment debtor an obligation to indemnify against the judgment), *cert. denied,* —— U.S. ——, 107 S.Ct. 1956, 95 L.Ed.2d 528 (1987); *Ambromovage,* 726 F.2d at 992 (holding that the district court had power to hear defendant's counterclaim raising a state law set-off in conjunction with plaintiff's federal question claim because a key factual question which "implicate[d] the entire factual matrix" of the case was common to both the federal claim and the ancillary counterclaim); *Cf. PAAC v. Rizzo,* 502 F.2d 306 (3d Cir.1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975) (holding that a defamation claim by a city agency director against the mayor was insufficiently related to the federal question of the mayor's ability under the federal anti-poverty law to terminate the agency director, but providing no indication of the facts in that case or its factual relationship to the termination claim, other than to conclude that it was distinct).

We conclude that Sorensen's slander claim (which arose out of five statements made by Nanavati) emerges from the same nucleus of operative fact as the federal claims. As in *Ambromovage,* a critical background fact (the enmity between the two physicians) is common to all claims. For instance, Sorensen's slander claim is ancillary to Nanavati's antitrust claim. In his antitrust claim, Nanavati challenged the revocation of his staff privileges and alleged that the defendants had engaged in a group boycott. Nanavati's discussions with the press as well as the substance of his allegations against Sorensen would constitute relevant facts for both sides. Nanavati could use the Steinmeyer incident as evidence of defendants' unconcern for pa-

---

from the fact that whereas pendent claims supplement plaintiff's claims, ancillary claims, supplement counterclaims and cross claims. In *Ambromovage v. United Mine Workers of America,* 726 F.2d 972, 989–90 (3d Cir.1984), this court held that the two tests are identical, at least for the purpose of federal question jurisdiction.

**8.** This last prong does not implicate the court's power to entertain the suit, but rather addresses the question whether the district court, as a

matter of convenience, fairness and federalism should address the state law claims. *See Sparks v. Hershey,* 661 F.2d 30 (3d Cir.1981).

**9.** We note that this case has been through a long trial and that the parties, as well as the federal court system have expended much time and resources. Obviously, however, arguments based on efficiency cannot overcome a lack of constitutional power to hear the case, *see, e.g., Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 196 (3d Cir.1976).

tients (thereby exposing defendants' asserted motive for excluding Nanavati as pretextual). In defense of the antitrust claim, Sorensen, the Hospital, and the Executive Committee would be expected to present evidence demonstrating the propriety of their motivation for excluding Nanavati—that Nanavati was impossible to work with and that he disrupted the amicable and supportive environment conducive to high quality patient care. Sorensen, the Hospital, and the Executive Committee could use Nanavati's statements to the press to argue that Nanavati was subversive and difficult.

■ We therefore believe that the district court was eminently reasonable in perceiving that all the facts of the slander incidents would be before it in any case and that Sorensen's claim was properly related to the federal questions.[10]

### C. Fact/Opinion

■ Having found that jurisdiction exists, we must reach the merits of Sorensen's slander claim. We conclude that Nanavati's comments to the reporters fall within the realm of constitutionally protected opinion.[11] The Supreme Court of New Jersey has held that "statements of opinion

---

**10.** Furthermore, we hold that Sorensen's and Nanavati's tortious interference with business claims were properly appended to this action. As noted *infra* in Part IV, Sorensen's tortious interference claim is merely duplicative of his slander claim. Because we have jurisdiction over the slander claim, we have jurisdiction to address the claim of tortious interference. Although the question was raised by no party, we hold that Nanavati's tortious interference claims were pendent to his antitrust claim because they clearly arose out of a common nucleus of operative fact.

**11.** In deciding this question of defamation we must explore the murky boundary between state tort law and federal constitutional law. In an oft-quoted passage, this court explained in *Marcone v. Penthouse International Magazine for Men*, 754 F.2d 1072 (3d Cir.1985), *cert. denied*, 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1986):

> Although replete with First Amendment implications, a defamation suit fundamentally is a state cause of action. ... An adjudication of a defamation case involves both state and federal law inquiries. A court must determine: (1) whether the defendants have harmed the plaintiff's reputation within the

are entitled to constitutional protection no matter how extreme, vituperous, or vigorously expressed they may be." *Kotlikoff v. The Community News*, 89 N.J. 62, 444 A.2d 1086, 1091 (1982). The *Kotlikoff* court cited the famous dicta of the Supreme Court:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974). *See also Dairy Stores, Inc. v. Sentinel Pub. Co.*, 104 N.J. 125, 516 A.2d 220, 231 (1986) (citing *Kotlikoff* and *Gertz*).

The decision to shield opinion from liability for defamation represents an attempt to balance the constitutional protection of speech with the rights of individuals not to be defamed. New Jersey favors the interests of free speech even though statements of opinions may cause injury, because, unlike false statements of fact, opinions are more likely to contribute to a robust debate. *See Kotlikoff*, 444 A.2d at 1091.

---

meaning of state law; and (2) if so, whether the First Amendment nevertheless precludes recovery.

*Id.* at 1077 (quoting *Steaks Unlimited v. Deaner*, 623 F.2d 264, 269–70 (3d Cir.1980)). *See Jenkins v. KYW*, 829 F.2d 403, 405 (3d Cir.1987) (quoting *Marcone*). Therefore, we first must consider whether New Jersey would allow a defamation action under the circumstances of this case. If we believe that New Jersey would recognize a defamation action, then we may examine whether constitutional protections nevertheless would defeat that action. In the case of New Jersey, which has consciously adopted constitutional principles in deciding this question, *see Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446 (3d Cir.1987) (noting that New Jersey has intertwined the fact/opinion distinction with federal constitutional law, and has relied upon the Restatement approach to draw the distinction), the two inquiries may tend to collapse. Because we prefer not to reach the constitutional question unnecessarily, and at all events because we are bound by *Dunn, discussed infra*, we will decide this case on the basis of New Jersey defamation law.

Recognizing this doctrine is, of course, only the beginning; the harder task is actually differentiating potentially unprotected false statements of fact from protected opinion. The district court recognized that opinion is protected but rejected Nanavati's arguments that his statements constituted opinion. Instead, relying heavily on the Restatement (Second) of Torts § 566, comment b (1977), the district court held that Nanavati's statements were unprotected "mixed" opinions because they implied the existence of undisclosed facts. For the reasons that follow, we will reverse that determination.

Recently, this court confronted the question of how New Jersey differentiates between fact and opinion. We determined that New Jersey would follow the approach of the Restatement (Second) of Torts in determining the distinction. *See Dunn v. Gannett New York Newspaper, Inc.*, 833 F.2d 446 (3d Cir.1987).

According to the Restatement approach that we applied in *Dunn*, and which the New Jersey Supreme Court has approved in *Kotlikoff*, 444 A.2d at 1089, and *Dairy Stores, Inc. v. Sentinel Publishing Co.*, 104 N.J. 125, 516 A.2d 220, 231 (1986), "pure" opinions are either statements which provide the underlying factual assumptions of the speakers or statements made where those assumptions are known to the listener. Such "pure" opinion is fully protected. Mixed opinions, however, "imply the existence of defamatory unknown facts that justify the opinion expressed." R. Smolla, *Law of Defamation*, § 6.04[3], at 6–17 (footnote omitted); *See* Restatement (Second) of Torts § 566, comment c (1977). Where facts upon which the opinion is based are not disclosed and the listeners have no basis for knowledge, such "mixed opinion" does not merit absolute protection.

In applying the Restatement approach, therefore, the court must examine a statement in context.[12] The examination of context itself looks at many factors. Relevant here are considerations of the nature of the discussion in which the allegedly defamatory statements were made. In *Kotlikoff*, the court analyzed a letter to the editor of a newspaper and concluded that allegations of a "huge coverup" and a "conspiracy" were not, in context, allegations of criminal activity, but merely "pejorative rhetoric." 444 A.2d at 1091. Statements surrounded by other statements of opinion (such as a debate on a controversial topic) are also likely to be understood as opinions.

The key factor in analyzing the statements at issue are the nature of the listeners' understanding. The circumstances of Nanavati's conversation with the reporters strongly favor treating Nanavati's statements as protected "pure" opinion. It is essential to emphasize that this is an action for *slander* for speech to reporters, and *not libel* for the published article.

The reporters to whom the alleged slander was spoken knew of the facts regarding this long standing and well-publicized feud. When Nanavati spoke to the reporters, the controversy between Nanavati and Sorensen had been raging in public for several years and the Hospital recently had released a comprehensive report of its investigation of Nanavati (the Black Book). That report included a discussion of the allegedly misread EKG, and a copy of Dr. Meister's report. The report also included a lengthy discussion of Nanavati's troubles with the Hospital and Nanavati's complaints about Hospital practices. That the reporters to whom Nanavati made his statements were aware of the existence of the Black Book and its contents is evidenced by their discussion of it in the arti-

---

12. We note that the Restatement's approach is not the only means of analyzing the fact/opinion dichotomy, and the New Jersey Supreme Court has so recognized. *See Kotlikoff*, 444 A.2d at 1090–91. In *Dunn*, we applied the Restatement because it answered the fact/opinion question completely. *See* 833 F.2d at 453 ("the Restatement format is the appropriate route to follow *here*") (emphasis added). However, we also noted that New Jersey has incorporated many constitutional principles and decisions in ascertaining the distinction between fact and opinion. *Id.* Here, as in *Dunn*, we find that we need not, however, venture beyond the Restatement, which New Jersey has adopted, to determine that the statements are indeed protected opinion.

cles. Thus, Nanavati addressed knowledgeable listeners who were aware that Dr. Meister had absolved Sorensen of any negligence. The reporters were obviously aware that the speaker was presenting his opinion of Mrs. Steinmeyer's death and that other doctors and the Hospital held firmly opposing views. Nanavati's interpretation of events contributes to a robust debate on matters of public importance, namely the competence of medical care at a hospital.

We will briefly discuss each allegedly defamatory statement in turn. Statement # 1, that "conservative interpretation [of the EKG] probably cost the patient her life," and Statement # 2, that the "correct interpretation would have saved the patient's life because a pulmonary embolism is fully treatable," on the facts of this case are both protected opinions under New Jersey law. Both statements assert exactly the same proposition: that had Sorensen diagnosed a pulmonary embolism, the patient would have lived. It is undisputed that Sorensen did not diagnose a pulmonary embolism, and Nanavati's statement provides the factual basis for the conclusion that a correct diagnosis would have saved the patient's life; namely that "a pulmonary embolism is fully treatable." Beyond this, the only possible assertion in the statement is that a correct diagnosis by Sorensen, as opposed to a correct diagnosis by Nanavati, would have been acted upon. This is simply not defamatory. Furthermore, because the reporters were familiar with the long running dispute among the parties and knowledgeable about the underlying facts, the Restatement approach would protect these two statements as opinion.

Nanavati's question, statement # 3, "[h]ow can Dr. Meister be right when the patient is dead?" refers only to whether Meister was right to conclude that Sorensen was not at fault, and its rhetorical quality smacks of opinion. It also states explicitly the undisputed fact, the death of the patient, on which Nanavati based the view that Meister was wrong. However silly the statement may be as a refutation of Meister's judgment, the statement is clearly opinion.

Nanavati's statement # 4, that the Steinmeyer affair made him concerned about the lives of other patients and forced him to "cover-up" in discussions with the patient's husband seems at first blush, the most problematic of all the statements. Yet, all the statement conveys (albeit histrionically) is Nanavati's opinion that Sorensen was negligent. As noted above, the facts surrounding the incident were well known to the listeners, as evidenced by the articles.

Finally, we consider Nanavati's statement, "I never knew medicine could be so shallow," assigned as a basis of liability only by the Hospital. To the extent Nanavati's meaning can be discerned from the context of the conversation, it appears that Nanavati was conveying his disgust for the pettiness of his adversaries, and his factual basis for believing his colleagues lacked depth had been disclosed to the listeners.

In sum, we find that New Jersey would not allow recovery for slander for the aforementioned statements, given the circumstances under which these statements were uttered.

### D. *The O'Neil statement*

█ While testifying at trial, an EKG technician, Ann O'Neil, provided surprise testimony that Nanavati called Sorensen a "senile old doctor that had been there [the Hospital] for 20 years killing patients." Trial Transcript 6/30/86 p. 160. The statement was uttered in the course of a November 1985 conversation in which Nanavati complained to O'Neil that Sorensen had a locked drawer in which to keep his prescription pads but that he, Nanavati, did not. O'Neil testified that she was the only one to hear the comment alleging Sorensen's incompetence and senility and did not believe it. Additionally, she testified that when she challenged Nanavati, he asserted: "That's not opinion, that's facts." *Id.* at 159. Finally, O'Neil testified that she wrote the statement down and two days later gave it to her superior at the Hospital.

Upon hearing O'Neil's testimony, Sorensen successfully moved for leave to amend, over objection, to add this statement as a ground for his defamation claim. Nanavati claims that the mid-trial amendment was an abuse of discretion. He also submits that the statement to O'Neil caused no injury. In our view, the injury alleged here borders on the metaphysical. The facts indicate that no one who heard the slander believed it, and those who repeated the slander did so only to express outrage at the speaker. The entire situation seems more like a fiendish law school hypothetical gone amok than a compensable claim for slander. We believe that New Jersey would not compensate for slander under these facts. *See Sisler v. Gannett New York Newspaper, Inc.*, 104 N.J. 256, 516 A.2d 1083 (1986). Therefore we need not reach the question whether the court abused its discretion by permitting Sorensen to add this claim for slander so late in the proceedings.

In sum, we hold that statements # 1–5 constitute protected opinion and that New Jersey would not permit recovery upon them under the circumstances of this case. The defamation awards will therefore be set aside.

## IV. IS THE TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS CLAIM DUPLICATIVE OF THE SLANDER CLAIMS?

We next consider Sorensen's judgment against Nanavati for tortious interference with Sorensen's business relations. Nanavati argues that the tortious interference claim was entirely duplicative of the slander claims. He relies upon the Joint Final Pretrial Order, in which Sorensen explained that Nanavati had caused the interference "by making repeated false allegations of discrimination, improper patient care, improper practices, and inadequate qualifications." Joint Final Pretrial Order, May 12, 1986, at 52. Sorensen responds that the interference claim was based on far more than the specific acts of slander which constituted the slander claim. Sorensen does not deny, however, that the entire tortious interference claim was based on allegedly false statements of fact.

■ We conclude that the judgment on Sorensen's tortious interference claim must be set aside. If Sorensen wished to include in the claim acts of false allegations beyond those in the slander claim, he had a duty to set those forth with particularity. New Jersey courts have emphasized that the defenses applicable to defamation claims retain their full status for tortious interference claims if such tortious interference claims are based on verbal conduct. *See, e.g., Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 N.J. 552, 117 A.2d 889, 894–95 (1955); *Middlesex Concrete Products v. Carteret Ind. Ass'n*, 68 N.J.Super. 85, 172 A.2d 22 (App.Div.1961). Similarly, the United States Supreme Court recently indicated that the constitutional guarantees protecting speech against libel claims retain their full force regardless of the nature of the cause of action. *Hustler Magazine v. Falwell*, —— U.S. ——, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). If those privileges and constitutional protections are to have meaning, a plaintiff must be required to set forth allegedly actionable statements with particularity. *See* J.A. 146, 152–54 (district court's Memorandum Opinion dated 4/8/86 granting summary judgment in favor of Nanavati, partly because Sorensen failed to plead his defamation claim with specificity; grant of summary judgment later reconsidered to allow Sorensen to allege defamation claims arising out of May 11 article. J.A. at 190.). *See, e.g., National Bowl–O–Mat Corp. v. Brunswick Corp.*, 264 F.Supp. 221 (D.N.J.1967).

Here, Sorensen set forth no actionable statements either in his pleading or in his proposed pretrial order beyond those set forth in the slander claim. We conclude that he thereby limited his tortious interference claim to the same statements he set out in his defamation claim. *Cf. Bainhauer v. Manoukian*, 215 N.J.Super. 9, 520 A.2d 1154, 1175 (App.Div.1987) ("the malicious interference count ... is expressly predicated on precisely the same facts as are alleged in the defamation count. Proof or failure of proof of the operative facts of

the defamation count would, therefore, completely comprehend the malicious interference cause.")[13] Our rejection of liability for those statements therefore applies also to the tortious interference claim, and the judgment in favor of Sorensen on that claim therefore must be reversed.[14] Any other result would impermissibly allow Sorensen to circumvent the statute of limitations and, more importantly, the constitutional protections for defamation.

## V. CLAIM PRECLUSION

### A. *The Discrimination Claims*

In his initial complaint, Nanavati charged the Hospital and Executive Committee with discrimination based on his race and national origin, asserting claims under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e–17, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. The district court dismissed the Title VII claim on the ground that Nanavati was an independent contractor, and hence was not covered by Title VII. The jury found against Nanavati on his § 1981 claim. Nanavati has not appealed the district court's dismissal of the Title VII claim, but he has appealed the district court's refusal to grant a new trial on his § 1981 claim, maintaining that the evidence of discrimination is uncontradicted. However, before reaching the merits of Nanavati's appeal, we must confront the contention of the Hospital and Executive Committee that his claim is barred by the doctrine of res judicata.

Nanavati's original complaint in state court alleged that his dismissal was "the result [*inter alia*] of discrimination." Following the filing of his federal complaint, Nanavati sought to remove the discrimination claim from state to federal court. After originally granting Nanavati's request and subsequently recognizing that a plaintiff has no right of removal, the district court reconsidered and denied the petition *nunc pro tunc*. In the meantime, Nanavati had moved in state court to amend the complaint to drop the claim of discrimination. The Hospital and Executive Committee responded to Nanavati's motion to dismiss that fairness required dismissal only with prejudice. The record does not indicate that Nanavati objected. Without holding a hearing, the state trial court agreed with the Hospital and Executive Committee and entered an order dismissing the case with prejudice. Nanavati never appealed that order.

The elements of the § 1981 claim are, undoubtedly, subsumed within the state law discrimination claim. The district court nonetheless rejected the Hospital and Executive Committee's claim of res judicata on the grounds that Nanavati had not had a "full and fair opportunity to litigate the claim or issue" in the New Jersey courts. Nanavati attempts to buttress this rationale with the somewhat cryptic comment that the state court finding was unfair.

In *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 480–82, 102 S.Ct. 1883, 1896–98, 72 L.Ed.2d 262 (1982), the Supreme Court indeed recognized the general common law rule that res judicata does not apply to judgments which the party did not have a fair opportunity to litigate. The Court also recognized the longstanding principle that, whatever the contours of this common law doctrine, a federal court's decision to give preclusive effect *vel non* to a state court judgment is not discretionary. *Id.* at 482, 102 S.Ct. at 1898. The Court held that under 28 U.S.C. § 1738 a court can refuse to afford claim preclusive effect to a state court judgment only if the state itself would not afford preclusion or if er-

---

**13.** In special interrogatories to the jury, the district court attempted to avoid duplication of damages between the defamation and interference with business relations claims. This initiative, however, did not cure the fundamental defect of reliance on statements not specifically set out in the pleadings and therefore not subject to constitutional protection.

**14.** Nanavati also presented a tortious interference with business relations claim, which the jury rejected. Nanavati seeks a new trial because of allegedly faulty evidentiary rulings by the district court in connection with these claims. We hold that the district court did not abuse its discretion in making those rulings. *See Nanavati v. Burdette Tomlin Memorial Hosp.*, 645 F.Supp. 1217 at 1228 (1986).

ror in the prior judgment rises to the level of a violation of the constitutional right to due process. *See also Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980).

In this case, Nanavati has not contended either that New Jersey would not itself recognize the prior judgment or that the New Jersey court's procedures rise to the level of a constitutional violation. At all events, New Jersey accords full claim preclusive effect to default judgments, *see Joan Ryno, Inc. v. First National Bank*, 208 N.J.Super. 562, 506 A.2d 762, 766 (App. Div.1986), so that the mere failure of the court to hold a hearing in this case is not dispositive. Furthermore, Nanavati did not object to the dismissal of the complaint with prejudice. Even if the action of the New Jersey court was in error or an abuse of discretion, New Jersey provided Nanavati with a remedy for this error in the form of an appeal or a motion for reconsideration, thus we do not perceive that a due process violation occurred. This case is squarely controlled by *Kremer*. We therefore hold that Nanavati's § 1981 claim is barred by res judicata; hence we will affirm the district court's denial of Nanavati's new trial motion directed to that point.

### B. *The Antitrust Claims*

#### 1. Introduction

In a counterclaim and through subsequent amendment to the counterclaim at trial, Nanavati alleged that Sorensen conspired with the Executive Committee and the Hospital to boycott Nanavati's services in two ways: first, they allegedly conspired to revoke his hospital staff privileges; and second, they allegedly discouraged doctors from referring cardiological patients to Nanavati. The Hospital and Executive Committee contend that Nanavati's antitrust claims should have been precluded because of his earlier action in state court. Underlying the contention is New Jersey's antitrust statute, which is virtually identical to that of federal law, providing the same availability of treble damages and attorneys' fees. New Jersey Antitrust Act, N.J. S.A. §§ 56:9–1 to 56:9–19 (1986). The stat-

ute even provides on its face that courts should construe it "in harmony with ruling judicial interpretations of comparable Federal antitrust statutes." § 56:9–18. The only significant difference between the federal and state antitrust laws is New Jersey's lack of an interstate commerce requirement, which could only benefit Nanavati.

Res judicata bars not only claims that were raised in a previous proceeding but also claims that could have been raised. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981); *Gottdiener v. Roxbury Township*, 2 N.J. Tax 206 (1981) (citing *Bowers v. American Bridge Co.*, 43 N.J. Super. 48, 127 A.2d 580 (1956), *aff'd*, 24 N.J. 390, 132 A.2d 28 (1957) (applying Pennsylvania law)); *see generally* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4470, at 687–88 (1981). In determining the claim preclusive effect of a prior state court judgment in federal court, 28 U.S.C. § 1738 requires that a federal court look to the judgment's claim preclusive effect in state court. *Kremer*, 456 U.S. at 481–82, 102 S.Ct. at 1897–98. This rule applies even when the claim that might be precluded is within the exclusive jurisdiction of a federal court, such as federal antitrust claims. *See Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 379–86, 105 S.Ct. 1327, 1331–35, 84 L.Ed.2d 274 (1985).

However, a state court may never have an opportunity to address the question whether an exclusively federal claim is barred by a prior state judgment because a state court has no jurisdiction over such a claim. In *Marrese* the Supreme Court held:

[w]ith respect to matters that were not decided in the state proceedings, we note that claim preclusion generally does not apply where "[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts...." Restatement (Second) of Judgments § 26(1)(c) (1982). If state preclusion law includes this require-

ment of prior jurisdictional competency, which is generally true, a state judgment will *not* have claim preclusive effect on a cause of action within the exclusive jurisdiction of the federal courts.

Id. at 382, 105 S.Ct. at 1333 (footnote omitted) (emphasis in original). Because we determine that New Jersey claim preclusion does not apply to claims over which the initial New Jersey court lacked jurisdiction, i.e., to claims which *could not* have been brought in New Jersey state court, we need not reach the question whether the factual nexus of Nanavati's federal antitrust claim is sufficiently related to the claims tried in state court that New Jersey's res judicata-based "entire controversy doctrine" would apply.

2. Does New Jersey Claim Preclusion Contain a Jurisdictional Requirement?

Following the Supreme Court's direction in *Marrese*, we must consider whether New Jersey's claim preclusion rules would apply where, as here, the first court lacked jurisdiction over the claim advanced in the second court. *See Marrese*, 470 U.S. at 382, 105 S.Ct. at 1332–33; *Eichman v. Fotomat Corp.*, 759 F.2d 1434, 1437 (9th Cir.1985) (determining that federal courts must apply California preclusion law after *Marrese* and concluding that in California "the court rendering the prior judgment must have had jurisdiction to hear such claims" in order to preclude them); *id.* at 1440 (Kennedy, J., concurring) (maintaining that the jurisdictional requirement "is a rule of near universal application").

Because the exact question (involving a claim of exclusive federal jurisdiction) could not have been presented to the state court, this question has been described as "nearly metaphysical" in nature, *Marrese v. American Academy of Orthopaedic Surgeons*, 628 F.Supp. 918, 919 (N.D.Ill. 1986) (on remand from the Supreme Court); *see* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4470, at 675 (1981 & Supp.1987).[15] Nevertheless, we must examine the relevant case law to glean an understanding of whether New Jersey's claim preclusion law includes a jurisdictional requirement.

The general rule to which we have adverted is expressed in § 26(1)(c) of the Restatement (Second) of Judgments, *viz.*, that claim preclusion does not apply where "[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy ... because of the limitations on the subject matter jurisdiction of the courts...." Restatement (Second) of Judgments § 26(1)(c) (1982). Although the Hospital and Executive Committee concede that there is no New Jersey case on point, they argue forcefully that New Jersey would not follow the Restatement rule on the basis of New Jersey cases that demonstrate the breadth of that state's entire controversy doctrine, a breadth sufficient, they submit, to override the Restatement rule.

*Giudice v. Drew Chemical Corp.*, 210 N.J.Super. 32, 509 A.2d 200 (App.Div.), *certif. granted and remanded on other grounds*, 104 N.J. 465, 517 A.2d 448, *certif. denied*, 104 N.J. 465, 517 A.2d 449 (1986), provides an indication of the breadth of the entire controversy doctrine. In *Giudice*, the plaintiff, who had been dismissed from his job, brought a defamation action in

15. The impressive majority and dissenting opinions of the Seventh Circuit in *Marrese v. Am. Academy Ortho. Surgeons,* 726 F.2d 1150, 1161–62 (7th Cir.1984) (opinion of Posner, J., for the court) (en banc); *Id.* at 1173–83 (opinion of Cudahy, J., dissenting), recount the policy reasons for and against the use of res judicata in this context. *See generally* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure,* § 4470, at 241–46 (Supp.1987). Favoring application of res judicata is the policy that all claims arising out of a single transaction should be resolved in a single suit, particularly where, as here, the state action is virtually identical to the federal action. Militating against its application is the incentive this rule gives to plaintiffs to bring all their claims in federal court, thus inappropriately burdening federal courts with more cases and more decisions about state law. In addition, although the rationale does not apply here, Judge Cudahy noted that, because federal causes of action are often more complex than their state counterparts, this rule may unfortunately require litigation of complex claims when a dispute could be resolved more easily via the state courts. *See Marrese,* 726 F.2d at 1182.

New York, and then brought a wrongful discharge suit in New Jersey. The court dismissed the later suit on the basis of claim preclusion despite acknowledging that New York probably would not recognize a wrongful discharge cause of action similar to that in New Jersey. *Giudice* thus indicates the willingness of New Jersey courts to require the plaintiff to select the forum with the widest possible relief.

We note, however, that *Giudice* does not involve a question of the *jurisdictional* competency of the former court. The New York court in *Giudice* was empowered to hear the wrongful discharge suit, but would have dismissed the claim because the applicable New York substantive law had not abrogated the employment at will doctrine. Thus, the plaintiff was not prevented from bringing the claim, but simply faced a small prospect of succeeding in the New York court. Given this forum shopping scenario, the New Jersey court's preclusion of Guidice's wrongful discharge claim is understandable. It does not, however, indicate whether New Jersey would have barred the claim if the New York court could not have exercised jurisdiction over it.

Notwithstanding the apparent breadth of the New Jersey entire controversy doctrine, we are not at liberty to use the availability of the analogous state law claim to preclude the federal claim here. The Supreme Court in *Marrese* noted that in states that have a res judicata jurisdictional requirement, an earlier action "based on a state statute analogous to a federal statute, e.g., a state antitrust law, does not bar subsequent attempts to secure relief in federal court if the state court lacked jurisdiction over the federal statutory claim." 470 U.S. at 383 n. 3, 105 S.Ct. at 1333 n. 3. Although New Jersey unquestionably applies broad claim preclusion, several factors indicate that it nevertheless requires that any precluded claim be within the jurisdic-

tion of the first court: (1) the reliance of New Jersey courts on the Restatement (Second) of Judgments; (2) the language and application of the New Jersey entire controversy doctrine; and (3) the historic application of res judicata to claims prior to the merger of law and equity. We consider these factors in turn.

First, although we have found no instance in which a New Jersey court has adopted § 26(1)(c), the provision setting forth the jurisdictional requirement, New Jersey courts have relied on the Restatement (Second) of Judgments generally in determining the preclusive effect to be given to claims under the entire controversy doctrine. *See, e.g., Brown v. Brown,* 208 N.J.Super. 372, 506 A.2d 29 (App.Div.1986). In *Brown,* although the court did not have the opportunity to consider whether prior jurisdictional competency is a requirement of preclusion, the court indicated its approval of the jurisdictional requirement by quoting the entire § 26(1), including subsection (c), in a footnote.[16] 506 A.2d at 35 n. 2.

Second, the tenor of the New Jersey courts' approach to claim preclusion indicates that the entire controversy doctrine includes a jurisdictional requirement. For example, in *Bates Marketing Associates, Inc. v. Lloyd's Electronics, Inc.,* 190 N.J. Super. 502, 464 A.2d 1142, 1144 (App.Div. 1983), *appeal dismissed,* 97 N.J. 703, 483 A.2d 211 (1984), the court stated that preclusion applies to claims "which were not but should have been raised in the initial litigation." Although this formulation is somewhat tautological, presumably a claim over which the earlier court lacked jurisdiction is not one which should have been raised. Thus, New Jersey courts have declared that only those claims that "could have been raised" are excluded. *Gottdiener v. Roxbury Township,* 2 N.J.Tax 206 (1981) (citing *Bowers v. American Bridge Co.,* 43 N.J.Super. 48, 127 A.2d 580 (App.

---

**16.** Section 26(1)(c) states that a claim is not extinguished when:

> The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdic-

tion of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief.

Div.1956), *aff'd*, 24 N.J. 390, 132 A.2d 28 (1957) (applying Pennsylvania law)).[17]

Third, at its inception, the entire controversy doctrine included a jurisdictional requirement. Prior to the passage of the Judicial Article of the New Jersey Constitution of 1947, the courts of the state were divided between equity and law, a situation which presents an opportunity to determine whether the state would have given, albeit many years ago, preclusive effect to claims that could not have been tried in a court with limited (law or equity) jurisdiction. In *Ajamian v. Schlanger*, 14 N.J. 483, 103 A.2d 9, 11, *cert. denied*, 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954), then-New Jersey Supreme Court Justice Brennan noted that a prior action in an equity court in New Jersey

> would probably not have barred the subsequent action at law ... because the former Court of Chancery had no jurisdiction to entertain a claim for the purely legal remedy and it was rightly considered to be inordinately harsh and unjust to conclude a complainant, denied the opportunity in the Chancery action, from seeking the only remedy ... in fact available to him.

*Id.* 103 A.2d at 11 (citations omitted). Although *Ajamian* is distinguishable because, before the merger of law and equity, the legal and equitable claims could not have been tried together in either court, the case nevertheless indicates that when confronted by the question of the limited jurisdiction of courts of equity and law, the

New Jersey courts have declined to apply claim preclusion.

It is also important to note that New Jersey courts, in cases where a claim was first brought in federal court, have precluded state claims arising out of the same controversy, but only after a careful determination that the federal court had subject matter jurisdiction over the state claims. For example, in assessing whether the entire controversy doctrine barred the assertion of a state claim after a federal district court's dismissal of related claims, the Appellate Division in *Blazer Corp. v. New Jersey Sports & Exposition Authority*, 199 N.J.Super. 107, 488 A.2d 1025, 1028 (App.Div.1985), stated that "[t]he single controversy doctrine is available to bar plaintiffs' claims ... only if the federal court had the 'power' to exercise pendent jurisdiction over those claims." Because it determined that the federal court did have subject matter jurisdiction over the claims raised in the subsequent state claim, the court precluded the state claims. Thus, the court premised its application of claim preclusion on existence of subject matter jurisdiction in the first forum. *See also Ferger v. Local 483*, 94 N.J.Super. 554, 229 A.2d 532, 541 (Ch.Div.) (where federal court declined to exercise pendent jurisdiction over state claim arising from the same controversy, state claim not precluded in subsequent state action), *aff'd per curiam*, 97 N.J.Super. 505, 235 A.2d 482 (App.Div. 1967), *certif. denied*, 51 N.J. 181, 238 A.2d 468 (1968).[18]

---

**17.** Although distinguishable from the case *sub judice* because it applied to an issue actually litigated in another court, in *Roberts v. Goldner*, 79 N.J. 82, 397 A.2d 1090 (1979), the New Jersey Supreme Court adverted to the *res judicata* jurisdictional requirement. The court stated that "[a] cause of action once finally determined between parties on the merits *by a tribunal having jurisdiction* cannot be relitigated by those parties ... in a new proceeding." *Id.* 397 A.2d at 1091 (emphasis added) (citations omitted).

**18.** We note that the application of res judicata to cases in which the first tribunal was a state court of limited jurisdiction and the second was a state court of general jurisdiction does not advance the analysis. Although the cases indi-

cate that New Jersey does not preclude claims following prior decisions of such courts, the rationales offered therein for denying preclusion rest only in part on the inability to bring certain claims in the court of limited jurisdiction. *See, e.g., East Hanover Township v. Cuva*, 156 N.J.Super. 159, 383 A.2d 725, 727 (App.Div. 1978) (no preclusive effect given to an earlier decision by a court of limited jurisdiction where: (1) the court of limited jurisdiction applied a different standard of proof; (2) the losing party was unable to appeal from the first judgment; and (3) "the nature of the remedy available in the second suit in vindication of a public interest [was] more expansive than that in the first suit").

To summarize, *Marrese* sets up a two-part inquiry. The first part concerns whether the factual nexus of the antitrust claim is sufficiently related to the claims tried in state court that New Jersey's entire controversy doctrine would apply. Because we conclude that the second part is not met, however, we do not reach this question. We conclude that the second part is not met because we determine that New Jersey courts, if faced with the question, would follow Restatement (Second) of Judgments approach and would decline to preclude a claim over which the initial court lacked jurisdiction. Our conclusion that Nanavati's antitrust claims are not precluded requires us to address his contention that the district court erred in granting judgment n.o.v. as to those claims.

## VI. THE ANTITRUST CLAIMS

### A. *Procedural History; Problems and Contentions*

Nanavati's initial antitrust claim, which was included in his counterclaim to Sorensen's defamation action, was asserted against Sorensen alone. The counterclaim asserted that, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, Sorensen: (1) caused the revocation of Nanavati's hospital staff privileges; and (2) organized a doctors' boycott of patient referrals at the Hospital. The claim was premised on Sorensen's putative desire to exclude Nanavati because of his competitive threat to Sorensen's lucrative cardiological practice. As we have noted above, at the close of Nanavati's case he moved to amend the complaint and pretrial order to add the Hospital and the Executive Committee as defendants.[19]

The district court submitted the antitrust claim to the jury on rule of reason and *per se* grounds. The court instructed the jury that if it found that a group boycott existed and was motivated "in whole or in part by the legitimate concerns for quality of patient care, such as lack of professional competence, unprofessional behavior and the

like" the conduct was to be judged (under the rule of reason) by examining the defendants' actions to determine whether the boycott was an unreasonable restraint of trade. J.A. at 4403. The court also instructed the jury that if it found a group boycott without such motivation it should find that the conduct was *per se* unreasonable.

The jury returned a special verdict as follows:

B1. Was there a contract, combination, or conspiracy in restraint of interstate commerce?

Yes X

No ___

\* \* \* \* \* \*

B2. Was the Hospital part of the contract, combination, or conspiracy?

Yes X

No ___

B3. Was the Executive Committee part of the contract, combination, or conspiracy?

Yes X

No ___

B4. Was Dr. Sorensen part of the contract, combination, or conspiracy?

Yes ___

No X

\* \* \* \* \* \*

B5. Did any of the participants perform any act in furtherance of the contract, combination, or conspiracy?

Yes X

No ___

\* \* \* \* \* \*

B6. Did the contract, combination, or conspiracy take the form of a group boycott?

Yes X

No ___

\* \* \* \* \* \*

B7. Was Dr. Nanavati boycotted because of unprofessional behavior or viola-

---

**19.** Because we will affirm the district court's grant of judgment n.o.v. for the Hospital and Executive Committee, however, we need not ad-

dress the propriety of adding them as defendants.

tions of public service or other ethical norms?

Yes X

No ___

 \* \* \* \* \* \*

B8. Did the contract, combination, or conspiracy constitute an unreasonable restraint on interstate commerce?

Yes X

No ___

B9. Did the contract, combination, or conspiracy injure Dr. Nanavati in his business or property?

Yes X

No ___

 \* \* \* \* \* \*

B10. Did Dr. Nanavati first sustain injury before June 5, 1980?

Yes ___

No X

B11. What is the amount of damages which Dr. Nanavati sustained because of the contract, combination, or conspiracy?

$ *350,000*

645 F.Supp. at 1237–39.

The verdict is confusing at best. Despite Nanavati's attempt to prove that Sorensen was the ringleader in one overarching antitrust conspiracy—indeed that was the central theme of his trial strategy—the jury exonerated Sorensen. However, it found that the Executive Committee and the Hospital, who were added as defendants after the close of Nanavati's case-in-chief, had engaged in a combination or conspiracy that took the form of a group boycott of Nanavati's services. The jury found the Hospital and Executive Committee liable despite rejecting Nanavati's auxiliary theme: that the exclusion of Nanavati from the Hospital was motivated solely by anticompetitive intent. Rather, the jury found that these defendants had participated in the boycott because they believed Nanavati had participated in "unprofessional behavior or violations of public service or other ethical norms." 645 F.Supp. at 1239.

However, despite its finding of the defendants' (legitimate) motivations, the jury found the combination or conspiracy an unreasonable restraint on interstate commerce and returned a verdict in favor of Nanavati and against the Hospital and Executive Committee in the sum of $350,000, which, when trebled in accordance with 15 U.S.C. § 15(a), increased to $1,050,000.

At the threshold level of analysis, the exoneration of Sorensen and the finding that the Executive Committee and the Hospital acted out of at least some legitimate motivations leave the foundations for liability extremely vague. First, because the district court instructed the jury that the Hospital could not conspire with the Executive Committee, its agent, it is unclear who were the parties to the conspiracy. No interrogatory regarding other possible conspirators was submitted to the jury, and therefore there is no basis for a conclusion as to who, if anyone, the Hospital's co-conspirators were.[20] Second, the very basis of liability is vague. The jury found that the conspiracy had imposed an unreasonable restraint on commerce with anticompetitive effects, despite its finding of defendants' good intentions. But we do not know whether the jury believed that the defendants' opinion of Nanavati simply was mistaken or whether it believed that the boycott was an unreasonable restraint of trade even if Nanavati had engaged in unprofessional conduct or violations of accepted professional norms. We also do not know which of the two alleged restraints (revocation of staff privileges or boycott of referrals) actually existed in the jury's view, and which of them the jury believed to be unreasonable.

The district court granted judgment n.o. v. for the Hospital and Executive Committee because it concluded that the record was "devoid of evidence to support a finding that either the Hospital or the Executive Committee participated in any conspiracy designed to stifle competition or engaged in any unlawful restraint of trade

---

**20.** The district court noted that the parties decided not to request a special finding seeking that the jury determine whether non-defendants participated in the alleged conspiracy. 645 F.Supp. at 1229 n. 20.

that had an anti-competitive effect." 645 F.Supp. at 1229. The parties now renew their arguments over the district court's reasoning, and the Hospital and Executive Committee attempt to raise additional grounds for setting aside the jury's verdict.[21]

Nanavati maintains that the district court erred in concluding that the record lacked evidence to support the jury's finding of liability against the Executive Committee and Hospital. He first contends that, under *Weiss v. York Hospital*, 745 F.2d 786 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985), as a matter of law, the Executive Committee comprised a combination in regard to the revocation of his staff privileges and boycott of referrals. He also contends that the Hospital's contract with Komansky for cardiological testing constituted a contract in restraint of trade. Perhaps recognizing that the Hospital's involvement in the Komansky contract does not constitute a contract, combination or conspiracy relating to the two matters submitted to the jury—the staff privileges revocation and the alleged boycott of referrals—Nanavati contends that the Hospital is liable to the extent it acted to further the Committee's unlawful combination and for the acts of individual physicians on its staff. Moreover, implicitly conceding that the case does not implicate a *per se* violation of the antitrust laws, Nanavati contends that the Committee's actions constituted an unreasonable restraint of trade because they had an anticompetitive purpose and effect.

The Hospital and Executive Committee contend that Nanavati failed at trial to: (1) identify the participants in the alleged conspiracy; (2) properly define the relevant product and geographic market or prove anticompetitive effect within that market;

and (3) prove anticompetitive motivation on the part of either the Hospital or Executive Committee, and that these failures are fatal to his case.[22]

■ Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), provides in part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal....

Under settled law, the jury must find three elements to prove a violation of the Act: (1) a contract, combination or conspiracy; (2) in restraint of trade; and (3) an effect on interstate commerce. The effect on interstate commerce is not at issue.

### B. *Contract, Combination or Conspiracy*

1. Introduction: Summary Disposition of Certain Issues

The jury found that both the Hospital and the Executive Committee participated in a combination or conspiracy, regarding either the revocation of Nanavati's staff privileges or the subsequent boycott of referrals (Nanavati's two theories of antitrust violation). Ruling upon the Hospital's and Executive Committee's motion for judgment n.o.v., the district court, following our opinion in *Weiss*, 745 F.2d at 816, concluded that the Executive Committee, having issued a recommendation that Nanavati's staff privileges be terminated, comprised a "combination" for antitrust purposes. However, the court absolved the Hospital of liability arising from the staff privileges revocation on the grounds that, under *Weiss*, the Hospital could not legally conspire with its staff and that no other potential conspirator was available.

■ It was settled by *Weiss* that, when the Executive Committee acts as a body, it

---

**21.** We note that defendants have not raised, and we do not here address, the question whether the Hospital's peer review actions were immune under the doctrine of *Parker v. Brown*, 317 U.S. 341, 350–51, 63 S.Ct. 307, 313–14, 87 L.Ed. 315 (1943). *See Patrick v. Burget*, —— U.S. ——, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988).

**22.** Our review of the district court's judgment n.o.v. is plenary. We must "determine, as a matter of law, whether the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.'" *Smollett v. Skayting Dev. Corp.*, 793 F.2d 547, 548 (3d Cir.1986) (quoting *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir.1969)).

constitutes a "combination." In *Weiss*, looking to the economic substance of the staff arrangement, we determined that each medical staff member has an independent economic interest separate from each other member's interest and thus that the medical staff cannot be considered a single economic entity. 745 F.2d at 815. We held "that, as a matter of law, the medical staff is a combination of individual doctors and therefore that any action taken by the medical staff satisfies the 'contract, combination or conspiracy' requirement of section 1." *Id.* at 814. Because the Executive Committee members, as members of the medical staff, are independent actors comparable to the members of the medical staff in *Weiss*, we agree with the district court that the Executive Committee is similarly a combination, at least with regard to the Committee's recommendation regarding the revocation of Nanavati's staff privileges. *See infra* page 118 (discussing the boycott of referrals).

 Nor need we dwell upon the question whether Nanavati satisfied the contract, combination or conspiracy requirement as it bears upon the Hospital's alleged participation in a conspiracy to revoke Nanavati's staff privileges. In *Weiss*, we concluded that a hospital could *not* conspire with its medical staff, as an entity, because the staff "operated as an officer of a corporation would in relation to the corporation ... [and] had no interest in competition with the hospital." 745 F.2d at 817. We therefore conclude that the district court correctly held that the Hospital could not conspire with the Executive Committee.

 Nanavati maintains, however, that *individual doctors'* actions regarding the boycott of referrals should be sufficient to envelop the Hospital in a conspiracy since the emergency room, where discussions regarding the boycott allegedly took place, was operated under contract with the Hospital. In *Weiss*, we did not reach the question whether individual members of a medical staff, operating under contract to a hospital, could ever conspire with the hospital. Although the physicians in the Hospital's emergency room here were not acting

as officers of the corporation, they, like the doctors in *Weiss*, had no interest in competition with the Hospital. The doctors stood to gain or lose from the successful operation of the emergency room as did the Hospital itself. Moreover, Nanavati presented no evidence linking the alleged boycott of referrals to the Hospital's involvement in the revocation decision. We therefore conclude that evidence of emergency room doctors' alleged conspiratorial acts, even if they had related to the revocation decision, would not support a finding that the Hospital was a conspirator.

Turning to the Executive Committee and focusing solely on the alleged boycott of referrals, because there is no contention that the Executive Committee itself took any action in furtherance of the boycott, we must consider whether the Executive Committee *qua* Committee is a combination for this purpose, and we must also address the question whether there is any evidence that the members of the Committee participated in a conspiracy. We turn now to these questions.

### 2. Boycott of Referrals by the Executive Committee or Its Members

Nanavati theorized that Sorensen led a group boycott of patient referrals. The district court rejected liability for the alleged boycott on the ground that Nanavati had proven no link between the doctors who allegedly declined to refer patients (who were not named as individual defendants) and either the Hospital or the Executive Committee. We will therefore consider whether the Executive Committee could comprise a combination in regard to the boycott of referrals and, if not, whether there is any evidence implicating individual members of the Committee in a conspiracy.

Nanavati maintains that because the actions of the Executive Committee are the actions of a combination under *Weiss*, the Committee must be a combination in regard to the boycott of referrals. However, Nanavati's argument fundamentally misconstrues our holding in *Weiss*, where the medical staff of York Hospital, like the Executive Committee, had the authority un-

der the hospital's corporate charter to make staff privilege recommendations. In *Weiss*, because members of the medical staff were independent economic actors, we held that any action taken by the medical staff satisfied the "contract, combination or conspiracy" requirement of section 1. Thus, we held that when the medical staff acted, it comprised a combination and "the absence of evidence of any other co-conspirator(s) is irrelevant." 745 F.2d at 814.

It does not follow, however, that where, as here, the Executive Committee is not alleged to have acted as an entity in furtherance of the conspiracy, it should be considered a combination. Our conclusion in *Weiss* was premised on the concept that where individual actors take actions as a group, they are a combination for the purposes of those actions. Where no group action is taken, no such combination can exist. In short, we did not hold in *Weiss* that because the actions of the medical staff constitute the actions of a combination, even where there is no allegation that the staff acted as a group, the "contract, combination or conspiracy" requirement has been met. Such a group is a combination as a matter of law only for the actions it takes as a group.

 Here, Nanavati does not maintain that the Committee took any group action. Thus, unlike *Weiss*, for the purposes of the boycott of referrals, we conclude that the Executive Committee does not constitute a combination as a matter of law. Instead of group action by the Executive Committee, Nanavati points to the actions and motivations of medical staff members who were not on the Committee. Nanavati maintains that because there is evidence of a boycott by members of the medical staff, the district court erred in finding no evidence that the Executive Committee participated in a conspiracy to boycott Nanavati. Nanavati's conclusion does not follow, however, because he has not shown that any members of the Executive Committee—none of whom were cardiologists—committed any acts in furtherance of the referrals boycott.

We therefore must consider whether Nanavati introduced sufficient evidence from which the jury could have inferred that Executive Committee members were conspirators in the boycott of referrals. In *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Supreme Court determined the standard for when sufficient evidence exists to permit the inference of an antitrust conspiracy:

> The correct standard is that there must be evidence that tends to exclude the possibility of independent action.... That is, there must be direct or circumstantial evidence that reasonably tends to prove ... a conscious commitment to a common scheme designed to achieve an unlawful objective.

*Id.* at 768, 104 S.Ct. at 1473. In *Tunis Brothers Co. v. Ford Motor Co.*, 763 F.2d 1482, 1491 (3d Cir.1985), *vacated and remanded*, 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986), *reinstated*, 823 F.2d 49 (1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1013, 98 L.Ed.2d 979 (1988), we held that "[t]hose who, with knowledge of the conspiracy, aid or assist in carrying out the purposes of the conspiracy make themselves parties thereto and are equally liable to or guilty with the original conspirators." (footnote omitted). However, Nanavati has presented neither evidence from which the jury could infer that the Executive Committee actually participated in the conspiracy nor acts that aided or assisted the alleged boycott of patient referrals.

Nanavati has pointed to the testimony of a Dr. Splitter that several doctors agreed "on the Hospital floor and at a restaurant meeting of the Staff, to take actions against 'the Indian.'" Nanavati Br. at 16 (quoting J.A. at 4071). For us to reverse the district court's determination, we must find some evidence in the record from which the jury could have concluded that these doctors conspired with either the Hospital or the Executive Committee to boycott referrals of patients to Nanavati. Of course, the mere fact that the "agreement" took place in the Hospital does not implicate the Hospital itself in the conspiracy. Nanavati does not maintain that the Hospital took official action in furtherance

of the boycott. Moreover, Splitter's testimony does not indicate Executive Committee involvement.

First, an examination of Splitter's testimony reveals that the "agreement" at the Hospital consisted of "a remark about Indian doctors, that the Indian doctors are overrunning us and we have to stop it," J.A. at 4071, and that it was made by Sorensen, who was exonerated by the jury. At trial, Splitter could not recall who heard the remark, much less that any members of the Executive Committee agreed to act on it. Second, Splitter's testimony indicates that the "meeting" that took place at a local restaurant was a staff party, and that the doctors involved included Sorensen, a Dr. Napoleon, Dr. Joseph Furey, and "many others." J.A. at 4072. Nanavati does not maintain, and the record contains no evidence that would lead us to the conclusion, that any of these individuals were members of the Executive Committee or that there was any other Committee or Hospital involvement in these discussions. *See* 6 P. Areeda, *Antitrust Law* ¶ 1417b, at 98 (1986) ("Mere conspiratorial opportunity is routinely and correctly held insufficient to support a conspiracy finding." (footnote omitted)). Moreover, to the extent Nanavati sought to demonstrate that the Executive Committee members interacted with the allegedly boycotting doctors, we note that, as the Court of Appeals for the District of Columbia Circuit held in *Kreuzer v. American Academy of Periodontology*, 735 F.2d 1479, 1488 (D.C.Cir.1984), "[t]he mere showing of frequent relations between alleged conspirators ... is insufficient to infer an illegal agreement." (citations omitted).

Nanavati next maintains that there was evidence that emergency room physicians were instructed to keep referrals "in the family" and thus to boycott him. J.A. at 4076. The testimony of Dr. DiRago indicated that the "in the family" statement was made by Dr. Sorensen, however, and did not implicate any Executive Committee

members. In response to a question from counsel about whether the statement reflected a policy of the Hospital, DiRago responded that "there is no general policy." J.A. at 4077. Thus, these statements provide no support for the assertion that either the Hospital or the Executive Committee conspired with doctors who allegedly were boycotting Nanavati.

Nanavati also relies on statements by Dr. Napoleon that "we have to fight" foreign doctors coming into the area, J.A. at 4335, and that "[w]e will bring in an American cardiologist" after removing Nanavati. J.A. at 4336. Dr. Napoleon was not a member of the Executive Committee, however.

Finally, Nanavati maintains that, "[t]o the extent the Hospital acted to further the Committee's unlawful combination, the Hospital is as liable as the Committee." Nanavati Br. at 16. However, because we conclude that the district court correctly determined that the record contains no evidence of involvement by the Committee or its members in the boycott of referrals, we need not reach the question whether the Hospital may be held liable for the Committee's actions. We therefore conclude that the district court correctly determined that the evidence does not support a verdict against either the Hospital or the Executive Committee based on the boycott of referrals.[23]

### 3. Conclusion

In sum, we conclude that Nanavati failed to present a case that the Hospital participated in a combination or conspiracy with respect to either its staff privileges revocation or in the subsequent boycott of patient referrals. We therefore will affirm the district court's grant of judgment n.o.v. for the Hospital. Although the evidence is similarly lacking as to the Executive Committee's participation in the alleged conspiracy to boycott patient referrals, because the Executive Committee is a combination for the purposes of the revocation of Nana-

---

**23.** Nanavati also maintains that an exclusive contract with Dr. Henry Komansky for the provision of stress and echocardiogram tests is sufficient to implicate the Hospital in a conspiracy to exclude him, but Nanavati does not indicate how the Komansky contract would demonstrate the Hospital's involvement in either of the two anticompetitive acts sought to be proved at trial—the staff privileges revocation or the boycott of referrals.

vati's staff privileges, we turn next to whether the district court properly granted judgment n.o.v. for the Committee on that claim, a consideration that turns on the sufficiency of evidence of damages.

### C. *Evidence of Damages*

█ Our conspiracy analysis leaves one remaining claim at issue: whether the Executive Committee's recommendation that Nanavati's staff privileges be revoked com-

prised a restraint of trade in violation of § 1 of the Sherman Act. The defendants have, with great force, asserted a number of substantive antitrust arguments as to why Nanavati did not make out such an antitrust claim.[24] However, we need not address these arguments because we note that Nanavati has simply failed to prove any damages from the revocation.[25]

Because the state court enjoined the revocation, Nanavati's absence lasted for only

**24.** In light of the jury's finding that he was excluded because of his unprofessional behavior, Nanavati does not contend that the defendant's conduct would support a finding of *per se* liability. But even under rule of reason analysis Nanavati's case is fraught with problems, especially considering a hospital's need to control the quality of its staff and to ensure that adequate patient care is provided. *See Weiss,* 745 F.2d at 821 n. 60.

As to anti-competitive motivation, the jury made a supported finding that Nanavati was boycotted "because of unprofessional behavior or violations of public service or other ethical norms," 645 F.Supp. at 1239, hence Nanavati cannot dispute that he was boycotted, at least in part, because of his unprofessional behavior. Because Sorenson was exculpated by the jury and no members of the Executive Committee were cardiologists, Nanavati has presented no rational theory of the economic gain that the Executive Committee stood to receive, or of concomitant harm to competition, from the revocation of Nanavati's staff privileges. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 280, 88 S.Ct. 1575, 1588, 20 L.Ed.2d 569 (1968)) (where plaintiffs are unable to assert viable economic theory supplying a "rational motive to join the alleged boycott," simple refusal to deal cannot support a finding of antitrust liability). Moreover, as the district court concluded, nothing in the record supported an assertion that the staff privileges revocation was based on an actual desire "for personal economic gain," or that even "the existence of a *potential* for economic gain by the Executive Committee members" was present. 645 F.Supp. at 1231 n. 28 (emphasis in original). Furthermore, the statement of a Dr. Napoleon that "we have to fight [foreign doctors], because now there will be so many doctors around the area and what happens to us[?]," J.A. at 4335–36, cannot be evidence of anticompetitive animus by the Committee because Dr. Napoleon was never a member of the Executive Committee.

As to anti-competitive effect, Nanavati's failure to present evidence of damages, as discussed in the text *infra,* parallels the failure here. The district court concluded that al-

though the Executive Committee's action would have diminished Nanavati's ability to treat patients, nothing in the record indicated that the action "substantially impaired competition." J.A. at 1231. On appeal, Nanavati contends that "[t]here can be little doubt of the anticompetitive effect," Nanavati Reply Br. at 16, and refers us to an earlier argument that "[o]uster of [him] from the Staff ... would result in only one cardiologist being available to the patients most in need of such specialty service, those requiring hospitalization." *Id.* at 12. Although revocation unquestionably affected Nanavati, our review focuses on the effect on competition in the relevant market. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 297–98, 105 S.Ct. 2613, 2621–22, 86 L.Ed.2d 202 (1985).

But the impact on the supply of cardiological services was necessarily limited because Nanavati's absence lasted for only five days, and the effect of the revocation was limited to Nanavati's ability to practice in the Hospital. As we note *infra,* Nanavati performed stress and echocardiogram tests in his office. Even though the temporary deprivation of staff privileges might have had an effect, it was incumbent upon Nanavati to put on at least *some* evidence of the impact of the exclusion on the market so that the jury, and this court on appeal, would not be forced to speculate as to what the injury might have been. However, he did not. Finally, not only was the impact on the supply of cardiological services limited, but there was no evidence that Nanavati's revocation had an effect on the cost of cardiological services. Although not required in all cases, evidence of higher prices is a relevant consideration, particularly in the absence of other indicia of economic effect.

**25.** Nanavati also has sought to rely on an exclusive contract between the Hospital and Dr. Komansky for the provision of stress tests and echocardiograms. However, Nanavati did not advance in his complaint, in his pre-trial memorandum, or on appeal that the exclusive contract with Komansky itself comprised an illegal practice, (presumably either an exclusive dealing or a tying arrangement) and has not linked the contract to the sole remaining defendant, the Executive Committee.

five days. Not only did the revocation last for a short period, but its effect was limited to Nanavati's ability to practice in the Hospital, and, *a fortiori*, did not restrict his lucrative office practice. The record is clear that even sophisticated tests such as stress tests and echocardiograms were performed by Nanavati in his own office; hence we must review the revocation in terms of its impact on Nanavati's ability to provide cardiological services that require hospitalization. But this point was never quantified on the record. Moreover, a review of the record reveals no evidence from which the jury could have concluded that Nanavati lost patients or EKG readings during the five day revocation period. We also note that Nanavati's practice has, in fact, increased from 1,200 patients at the time he initially filed his complaint, to 4,000 at the time of trial; hence the jury could not have simply inferred that Nanavati suffered long term damages from the five day revocation. On these facts, we find no basis for a jury verdict in Nanavati's favor based solely on the Executive Committee's revocation of Nanavati's staff privileges.

### D. *Summary*

In sum, because the Hospital could not conspire with either the Executive Committee or individual members of its staff, we conclude that the Hospital cannot be liable for its revocation of Nanavati's staff privileges or for the alleged boycott of patient referrals. Similarly, because the Executive Committee did not act as a body in regard to the boycott of referrals, it did not comprise a combination as a matter of law, and because there is no evidence in the record that its members participated in the boycott, the Committee cannot be liable under that theory.

The Executive Committee does comprise a combination insofar as it recommended that the Hospital terminate Nanavati's staff privileges. However, absent some evidence of damages resulting from the Executive Committee's revocation recommendation, we are unable to conclude that the district court's judgment n.o.v. for the Executive Committee was in error. We therefore will affirm the grant of judgment n.o.

v. for both the Hospital and the Executive Committee.

## VII. CONCLUSION

For the foregoing reasons, we will: (1) affirm the district court's denial of the new trial motion on Nanavati's § 1981 claim; (2) affirm the judgment n.o.v. on Nanavati's antitrust claims; (3) affirm the district court's determination that it had subject matter jurisdiction over the state law defamation and tortious interference with business claims but reverse the judgment for Sorensen on both claims; and (4) dismiss the cross appeal of the Hospital, Executive Committee and Sorensen.

Ironically, despite years of vexatious litigation, the parties will be where they were before the suit began. "Durum valde durum, sed sic lex est." *Penhallow v. Doane's Administrators,* 3 U.S. (Dall.) 54, 88–89, 1 L.Ed. 507, 521–22 (1795) ("Hard very hard, but such is the law").