**Ralph J. MILLER, Plaintiff,**

v.

**INDIANA HOSPITAL, et al., Defendants.**

**Civ. A. No. 81–1091.**

United States District Court, W.D. Pennsylvania.

March 9, 1992.

---

J. Bradley Kearns, Pittsburgh, PA, for plaintiff.

Larry A. Silverman, Pittsburgh, PA, David Serene, Indiana, PA, for defendants.

## MEMORANDUM OPINION

BLOCH, District Judge.

Before this Court is defendants' motion for summary judgment. For the reasons stated herein, the Court finds that the record, taken as a whole, demonstrates that a rational trier of fact would not find for plaintiff, *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and, therefore, there is no genuine issue for trial. Defendants' motion will be granted.

### I. Facts

This suit arises out of the revocation of plaintiff's medical staff privileges by defendant Indiana Hospital (Hospital) in 1977, and out of the Hospital's refusal to accept and process plaintiff's post-termination applications for reinstatement. The undisputed facts of this case are as follows. Plaintiff is a licensed physician specializing in urology, and obtained staff privileges at the Hospital in 1958. Indiana Hospital is the only general hospital in Indiana County, a county encompassing an area of approximately 825 square miles, and is centrally located within the county.

In the early 1960's, plaintiff purchased a tract of land in the vicinity of the Hospital. In 1964, he built a professional office building with a 5–physician capacity on the tract, and his own practice was moved into this facility. Also in the 1960's, plaintiff began plans for a new concept in Indiana County involving delivery of health services. The concept involved a group physician practice that would attract families by providing pediatric services as well as the services of general practitioners and medical and surgical specialists. This concept materialized as the Indiana Medical Center (IMC), for which plaintiff had a building erected in 1975. Prior to the building completion, plaintiff began recruiting physicians to staff the center, and employed two pediatricians at IMC as well as three consulting internists who practiced in Pittsburgh and made regular visits to IMC.

On February 16, 1977, Joseph P. White, a patient who had been under the care of plaintiff, died at the Hospital. The following day, defendant Dr. Melvin Williams, a member of the Medical Staff's Executive Committee, sent a report to defendant Dr. Richard Freda, the President of the Medical Staff, stating that the quality of care which plaintiff had rendered to White was below that which should be acceptable in any hospital. On February 22, 1977, Dr. Freda sent a letter to plaintiff inviting him to attend a meeting of the Executive Committee pursuant to the Hospital Staff Bylaws regarding the charges which had been made against him. On February 24, 1977, Dr. Williams sent another letter to the Executive Committee formally requesting that action be taken to suspend plaintiff's staff privileges. This letter cited additional instances of inadequate care provided by plaintiff. On February 26, 1977, the Executive Committee held an informal meeting which plaintiff attended. Plaintiff refused to discuss the charges against him and left the meeting abruptly.

On March 18, 1977, the Executive Committee sent written notice to plaintiff of its determination to recommend to the Board of Directors of the Hospital that his active staff privileges be revoked. Plaintiff demanded a hearing and indicated his intention to exercise his rights to defend himself in accordance with the Bylaws. Consequently, the Committee informed plaintiff of the hearing date and provided him with a list of charges against him and a list of proposed witnesses. The list of charges went beyond those included in the original complaint letter and request for revocation. In the interim, plaintiff requested that the Executive Committee appoint an impartial ad hoc committee to conduct the hearing because he viewed the Executive Committee as hostile and biased against him. The Committee denied the request and held a hearing beginning on June 15, 1977, and continuing for several days thereafter.

The hearing committee consisted of three members of the Medical Staff and one mem-

ber of the Dental Staff. Both parties were represented by counsel. The hearing officer presiding over the proceedings was counsel to the Hospital. The hearing committee recommended the revocation of plaintiff's staff privileges finding that plaintiff had engaged in disruptive, insulting, disparaging, disrespectful, abusive and other improper behavior towards physicians, nurses and administrative personnel and delineated numerous examples of such behavior. The Committee also found that plaintiff acted improperly in failing to request a medical consultation concerning White "under circumstances which should have clearly indicated to Dr. Miller the need for such consultation." (Hearing Committee Finding No. 2).

The committee also found that plaintiff had "failed to order, or to timely order, various standard, routine and necessary examinations, testings and laboratory work incidental and necessary for proper medical management of patient Joseph P. White's respiratory condition." (Hearing Committee Finding No. 3). In addition, the committee found that plaintiff had failed to comply with an order of the Bureau of Medical Assistance, barring him from further participation of writing of prescriptions under the Commonwealth Medical Assistance Program and that at various times plaintiff had violate Medical Assistance Rules and Regulations and Pennsylvania law by privately billing Medical Assistance patients, referred to him on a rotation basis by the Hospital. (Hearing Committee Finding Nos. 4, 11). The plaintiff was also found to have "made an improper and unprofessional comment and publication, by conducting a discussion with a layman, at which time Dr. Miller revealed confidential medical information about a certain patient's pap smear." (Hearing Committee Finding No. 6). Finally, plaintiff was found to have exhibited a lack of diligence in his duties as Chairman of the Infection Control Committee in 1976; a failure to cooperate with the Executive Committee of the Medical Staff concerning its Preceptorship Program in the year 1971; a failure to cooperate with the Executive Committee by refusing to serve on a Library Committee for the year 1975; and a failure to cooperate with the Hospital's administration by not preparing and submit-

ting complete and adequate patient care records. (Hearing Committee Finding Nos. 7–10).

On August 10, 1977, the Executive Committee adopted the recommendation by the hearing committee that all Hospital staff privileges and the staff membership of plaintiff be revoked. Plaintiff appealed to the Hospital Board of Directors. After an adversary hearing, a committee of four directors affirmed the determination of the Executive Committee and the full Board adopted their recommendation.

On October 14, 1977, plaintiff obtained a preliminary injunction *ex parte* from the Court of Common Pleas of Indiana County preventing revocation of his staff privileges. The Court dissolved the preliminary injunction on February 9, 1978, and denied a permanent injunction on June 29, 1978. The Court reviewed each of plaintiff's allegations and concluded that (1) the Hospital's revocation decision was in compliance with the Bylaws of the Hospital and the medical·staff; (2) the Hospital's conduct was not arbitrary, capricious or contrary to law; and (3) the Hospital's decision was based on proper cause. *Miller v. Indiana Hospital,* No. 35EQ1977.

Plaintiff appealed the decision of the Court of Common Pleas to the Superior Court of Pennsylvania. On April 3, 1980, the Superior Court affirmed the lower court's finding that: (1) the charges against plaintiff were supported by sufficient evidence; (2) the Hospital adequately investigated the charges; and (3) the Hospital afforded plaintiff comprehensive procedural safeguards, including an appeal of right to the Board of Directors. *Miller v. Indiana Hospital,* 277 Pa.Super. 370, 419 A.2d 1191 (1980).

During the pendency of the termination proceedings in 1977 and for several years following his termination, plaintiff applied for and was denied reinstatement of his staff privileges. Based on the 1977 revocation, the Hospital refused to consider his application and, in later years, refused to supply him with an application.

In 1980, plaintiff filed a petition with the Commonwealth of Pennsylvania Department

of Health (DOH) contending that the Hospital's refusal to furnish him with an application for staff privileges and to process his application violated state and federal regulations and Hospital Bylaws. DOH treated the petition as a formal complaint under 1 Pa. Code § 35.9 and instructed the Hospital to file a response. Thereafter, DOH advised plaintiff that "neither the Pennsylvania Department of Health regulations nor the bylaws of Indiana Hospital require that Indiana Hospital provide you with an application for medical staff privileges." After additional correspondence from plaintiff, DOH reaffirmed its decision and no further appeals were taken by plaintiff. *Miller v. Indiana Hospital*, 930 F.2d 334, 336 (3d Cir.1991).

Plaintiff then filed a complaint in federal court on July 2, 1981, against the Hospital and certain administrators and physicians, raising federal civil rights, antitrust and pendent state claims. His civil rights and the pendent state claims were dismissed in *Miller v. Indiana Hospital*, 562 F.Supp. 1259 (W.D.Pa.1983) (Mansmann, J.).[1] Only plaintiff's antitrust claims remain.

According to plaintiff, defendants effectively destroyed the IMC, eliminated his patient referrals and revoked his staff privileges, amounting to a willful abuse of monopolistic power to hamper competition. Plaintiff alleges that the revocation proceedings against him constituted unequal treatment by defendants as compared to the treatment of other staff physicians and that the disparity of treatment was motivated by the defendants' concerns that plaintiff's conduct and plans in the health care market posed an economic threat to the Hospital and individual physicians.

Defendants have moved for summary judgment in this case, stating that the pleadings, admissions of Dr. Miller, other evidence of record, and the affidavit of defendants' market expert establish the absence of a genuine issue of material fact on a number of the basic elements of Miller's claims under Sections 1 and 2 of the Sherman Act.

## II. Summary judgment standard

Under recent United States Supreme Court decisions, "a motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In the Third Circuit, the standard has been articulated as follows:

> While the moving party has the burden initially of identifying that evidence that demonstrates the absence of a genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of every element necessary to its case and on which it bears the burden of proof.

*Miller v. Indiana Hospital*, 843 F.2d 139, 143 (3d Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988).

The courts have made it clear that the moving party does not need to put on evidence to negate his opponent's claim. Rather, he may simply point "out those lacunae in the nonmovant's evidence which the movant claims would prevent a jury from finding in the nonmovant's favor at trial." *J.E. Mamiye & Sons*, 813 F.2d at 618 (*citing Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552). The purpose of Rule 56 of the Federal Rules of Civil Procedure is to allow the trial court to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. Hence, if the record taken as a whole "renders [plaintiff's] claim implausible," the plaintiff "must come forward with

---

1. Procedural history since the 1983 decision includes a district court ruling granting summary judgment on the antitrust claims based on Hospital motives, *Miller v. Indiana Hospital*, 660 F.Supp. 250 (W.D.Pa.1987) (Simmons, J.), and subsequent reversal, *Miller v. Indiana Hospital*, 843 F.2d 139 (3d Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988); and this Court's grant of summary judgment on immunity grounds, which was subsequently reversed. *Miller v. Indiana Hospital*, 930 F.2d 334 (3d Cir. 1991).

more persuasive evidence to support [his] claim than would otherwise be necessary." *Id.*

■ Although there have been presented issues of material fact as to defendants' intent in terminating plaintiff's staff privileges, *see Miller v. Indiana Hospital,* 843 F.2d 139 (3d Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988), in order to survive a motion for summary judgment, plaintiff must first satisfy certain legal prerequisites with respect to the relevant market and the effects of defendants' actions on competition.[2]

According to defendants, the basic flaw in plaintiff's Section 1 antitrust claim is the absence of proof of an antitrust injury; that is, proof that his termination from staff privileges actually harmed the public by reducing competition in any properly defined relevant market. As to the Section 2 claim, defendants argue that plaintiff has failed to establish monopoly power in the relevant geographic market.

*III. Section 1 claim*

Section 1 of the Sherman Act provides in part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1 (1982). Under settled law, in order for a plaintiff to prevail on a Section 1 claim, four elements must be proven: "(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the [plaintiff was] injured as a proximate result of that conspiracy." *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 763 F.2d 1482, 1489 (3d Cir.1985) (*Tunis I* ). *See also Nanavati v. Burdette Tomlin Memorial Hospital,* 857 F.2d 96, 117 (3d Cir.1988); *Weiss v. York Hospital,* 745 F.2d 786, 812 (3d Cir.1984). Although many actions restrain trade to one degree or another, whether an action violates Section 1 of the Sherman Act depends on whether the restraint is unreasonable. *Board of Trade of City of Chicago v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918); *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 166 (3d Cir. 1979).

*A. The rule of reason and market power*

■ In evaluating defendants' actions in the context of termination of hospital staff privileges, the "rule of reason" applies.[3] *Weiss,* 745 F.2d at 820; *Brown v. Our Lady of Lourdes Medical Center,* 767 F.Supp. 618, 628 (D.N.J.1991). According to the rule of reason, plaintiff bears the burden of proving that any concerted action taking place caused

---

**2.** Defendants have alleged that plaintiff has no standing to enforce the antitrust laws, since IMC was the only entity against whom the illegal restraint was allegedly directed. This Court disagrees. Plaintiff has made it clear that he alleges that the illegal restraint was directed to himself as a result of setting up IMC. Because plaintiff has alleged a direct economic injury traceable to defendants' actions that allegedly violated the antitrust laws, plaintiff has standing. *Out Front Productions, Inc. v. Magid,* 748 F.2d 166, 168 (3d Cir.1984) (*citing Association of Data Processing Service Organization v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)).

**3.** The rationale for use of the rule of reason under such circumstances has been aptly explained in *Brown v. Our Lady of Lourdes Medical Center,* 767 F.Supp. 618 (D.N.J.1991), as follows: "[T]he use of a hospital's internal review procedures does not imply [an] anti-competitive

state of mind. Review procedures are necessary to insure that hospital staff members are competent medical practitioners." *Goss v. Memorial Hosp. System,* 789 F.2d 353, 355 (5th Cir.1986). A medical staff is permitted to exclude an individual doctor based on that doctor's lack of professional competence or unprofessional conduct. When such a reason is offered for the exclusionary conduct, the court must apply the "rule of reason" to evaluate plaintiff's antitrust claim. *Weiss,* 745 F.2d at 820. The court must utilize the rule of reason when considering conduct otherwise subject to *per se* condemnation under § 1 of the Sherman Act due to the public service aspect of the medical profession. *Weiss,* 745 F.2d at 820–21 and cases cited therein.

*Brown,* 767 F.Supp. at 628. Plaintiff indicates that, for purposes of this motion, he assumes that the rule of reason applies.

an anti-trust injury by imposing an unreasonable restraint on trade; the defendants are not required to prove that the practices are reasonable. *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 709 (4th Cir.1991); *Brown*, 767 F.Supp. at 629; *Doctors Steuer & Latham, P.A. v. Nat. Med. Enterprises, Inc.*, 672 F.Supp. 1489, 1503 (D.S.C.1987), *aff'd*, 846 F.2d 70 (4th Cir.1988); ABA Antitrust Section, *Antitrust Law Developments* 15 (2d ed. 1984). Under the rule of reason:

the true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant factors.

*Weiss*, 745 F.2d at 817, n. 52 (*quoting Board of Trade*, 246 U.S. at 238, 38 S.Ct. at 244).

In order for plaintiff to meet his burden, he must prove what market he contends was restrained and that the defendants played enough of a significant role in the relevant market to impair competition significantly. *Oksanen*, 945 F.2d at 709; *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984). "Market power means the ability to injure consumers by curtailing output and raising price." *Steuer & Latham*, 672 F.Supp. at 1504 (*quoting Fishman v. Estate of Wirtz*, 807 F.2d 520, 568 (7th Cir.1986) (Easterbrook, J., dissenting in part)). Without such market power, any restraint on trade created by the defendants' actions is unlikely to implicate Section 1. *Oksanen*, 945 F.2d at 709.

### B.  Defining the market

■ Market definition requires both a geographic and a product dimension. It is a "fundamental tenet of antitrust law that the relevant market definition must encompass the realities of competition." *Oksanen*, 945

F.2d at 709 (*citing United States v. Grinnell Corp.*, 384 U.S. 563, 572–73, 86 S.Ct. 1698, 1704–05, 16 L.Ed.2d 778 (1966)). Proper market definition "must include examination of both the alternatives available to consumers of hospital services in [Indiana] County and the alternatives available to [doctors practicing in the relevant product market] seeking job opportunities at [Indiana Hospital]." *Steuer & Latham*, 672 F.Supp. at 1504.

#### 1.  The relevant product market

The relevant product market consists of those:

commodities reasonably interchangeable by consumers for the same purposes. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 [76 S.Ct. 994, 1007, 100 L.Ed. 1264] (1956); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1062–63 (3d Cir.), *cert. denied*, 439 U.S. 838 [99 S.Ct. 123, 58 L.Ed.2d 134] (1978). Factors to be considered include price, use and qualities. *du Pont de Nemours*, 351 U.S. at 404 [76 S.Ct. at 1012]. Accordingly, the products in a relevant product market would be characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for the other like goods in that market. *Id.* at 380, 400 [76 S.Ct. at 998, 1010].

*Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1991) (*Tunis II*).

Defendants accept plaintiff's product market definition—"physician services involving the use of hospital facilities and hospital services." (*See* answers to interrogatories (Set II) at ¶ 1 and Miller depo. (Exhibit 15)). Plaintiff, however, also points out that within the primary product market, well-defined submarkets may exist, whose boundaries are determined by practical factors such as the product's particular characteristics and uses, unique production facilities and distinct customers and prices. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962); *Eastern Dental Corp. v. Isaac Masel Co., Inc.*, 502 F.Supp. 1354, 1360 (E.D.Pa.1980). Relying on this

precedent, plaintiff states that a method of product or service distribution such as the provision of medical services in a small ambulatory care clinic like IMC also can be considered a relevant product market or submarket for antitrust purposes. Plaintiff submits that there is a well-defined market or submarket for the services offered by IMC which were reasonably interchangeable with and in obvious competition with certain of the Hospital's services, particularly laboratory, radiology and minor surgery.

Defendants argue that plaintiff's attempt to interject a submarket theory should be rejected for a number of reasons. First, until the instant motion, plaintiff has never asserted a submarket theory and should be precluded from doing so at this late date, 11 years after the filing of the complaint. Second, plaintiff has provided no evidence that would allow the Court to recognize such a submarket. Third, plaintiff has failed to present any evidence that any of the defendants had "market power" in this submarket, contending that most doctors' offices provide laboratory, radiology and minor surgery services.

Plaintiff has the burden of proving that laboratory, radiology and minor surgery services constitute the entire relevant market and that other services were not "reasonably interchangeable." *Tunis II,* 952 F.2d at 724. Putting aside the fact that plaintiff has asserted this theory at such a late date in the litigation of this case, the Court finds that plaintiff failed to produce sufficient evidence that the relevant submarket is laboratory, radiology and minor surgery services. *Steuer & Latham,* 672 F.Supp. at 1512, n. 25 (citing *Military Services Realty, Inc. v. Realty Consultants of Virginia,* 823 F.2d 829 (4th Cir.1987) (stating requirement for expert testimony on such issues)).[4] Further, assuming that plaintiff submitted evidence that laboratory, radiology and minor surgery services is a relevant submarket, plaintiff has presented no evidence tending to show that defendants possessed market power within that submarket. Therefore, the Court finds

that the relevant product market is physician services involving the use of hospital facilities and hospital services.

### 2. Relevant geographic market

According to plaintiff, the relevant geographic market is Indiana County or the central portion thereof which the Hospital refers to as its primary service area. Defendants do not accept plaintiff's definition of the relevant geographic market. According to defendants, the relevant geographic market, at a minimum, includes five counties, encompassing nine hospitals within 35 miles of Indiana Hospital. (Ellis affidavit at 4).

As with the relevant product market, the plaintiff bears the burden of proving the relevant geographic market. *Tunis II,* 952 F.2d at 726 (citing *Pennsylvania Dental Ass'n. v. Medical Service Ass'n. of Pa.,* 745 F.2d 248, 260 (3d Cir.1984), cert. denied, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985)). The relevant geographic market has been defined as "that geographic area in which there is effective competition in the sale and distribution of particular products or services [in this case, physician services involving the use of hospital facilities and hospital services], and in which persons or entities actually do, or potentially may, compete in the conduct of their business operations." *Steuer & Latham,* 672 F.Supp. at 1510. The relevant geographic market in antitrust analysis is that section of the country where a firm can increase its price without attracting new sellers or without losing many customers to alternative suppliers outside that area. *See* Landis & Posner, *Market Power in Antitrust Cases,* 94 Harv.L.Rev. 937 (1981).

"The definition of a relevant geographic market varies from case to case depending on the type of product and the geographic characteristics of an area, but the relevant geographic market must identify the area of effective competition that the defendant encounters when it offers its product or services for sale." *Collins [v. Associated*

4. Plaintiff has submitted a statement by a Dr. Gots to the effect that laboratory, radiology and minor surgery services offered by IMC were competitors to those services offered by the Hos-

pital. However, as noted *infra,* n. 5, Dr. Gots would not be qualified to so testify since this is not an area of expertise of Dr. Gots. *Id.*

*Pathologists, Ltd.* [676 F.Supp. 1388], 1987–1 Trade Cas. (CCH) ¶ 67,603,] 60,620 [C.D.Ill. Feb. 11, 1987), *citing Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320 [81 S.Ct. 623, 5 L.Ed.2d 580] (1961). *Steuer & Latham,* 672 F.Supp. at 1510. It is the geographic area in which a purchaser can practically turn to other sellers for products or services, in the event that the defendant seeks to raise its prices or restrict output. *Brown,* 767 F.Supp. at 630 (*quoting* W. Holmes, *Antitrust Law Handbook* (1991 ed.) at 295, *citing United States v. Philadelphia Nat'l. Bank,* 374 U.S. 321, 359, 83 S.Ct. 1715, 1739, 10 L.Ed.2d 915 (1963)). "Consequently, the relevant geographic market is not comprised of the region in which the seller attempts to sell its product, but rather it is comprised of the area where [its] customers would look to buy such a product." *Tunis II,* 952 F.2d at 726. The relevant geographic market must encompass those hospitals which are perceived as attractive alternatives to Indiana Hospital by physicians, third-party payors and "above all by patients, who 'vote with their feet' by leaving the county in large numbers when they require hospitalization." *Steuer & Latham,* 672 F.Supp. at 1514. The relevant geographic market does not include solely the plaintiff's preference for performing his services at the only hospital in the county.

Plaintiff himself testified in his deposition that he was aware of situations where physicians in Indiana, including himself, referred urological patients outside the County "with some frequency." (Miller depo. at 434–35). In addition, the plaintiff testified that the pediatricians on staff at IMC, who came to Indiana County from their practices in Pittsburgh, would typically admit a patient either to Childrens Hospital in Pittsburgh or to Indiana Hospital, depending on "whether the pediatricians felt that the facilities of Indiana Hospital or their talents were not satisfactory to care for a particular patient." *Id.* at 446–47. Plaintiff also testified that women would chose to leave Indiana County to have babies and people would undergo elective surgery outside Indiana County due to quality of care concerns, even though those services were also provided by Indiana Hospital. *Id.* at 466.

In addition, Melba Galonis, plaintiff's partner at IMC, testified that Indiana residents use Indiana Hospital in addition to hospitals in Armstrong County, Johnstown, Latrobe, Greensburg, and Pittsburgh based on "their preference." (Galonis depo. at 68–69). This testimony indicates to the Court that physicians and patients can, and do, choose from a variety of hospitals for procedures and are not limited to Indiana Hospital.

■ As stated by the Federal Trade Commission, the boundaries of a relevant geographic market in the context of a hospital industry depends on barriers to entry and the ability of consumers to switch to other hospitals:

> Because we are concerned only with an area in which competition could be harmed, the relevant geographic market must be broad enough that buyers would be unable to switch to alternative sellers in sufficient numbers to defeat an exercise of market power by firms in the area.... If an exercise of market power could be defeated by the entry of products produced in another area, both areas should be considered part of the same geographic market, since competition could not be harmed in the smaller area.... Looking at a "static" snapshot of a market is thus insufficient in itself.... Rather, evidence of current market behavior must be viewed in a "dynamic" framework that considers the possible competitive responses of firms outside the current market area to anticompetitive behavior of firms within.

*In the Matter of Hospital Corporation of America,* 106 FTC 361, 466 (1985), *aff'd., Hospital Corporation of America v. FTC,* 807 F.2d 1381 (7th Cir.1986), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987). As held in *Steuer & Latham,* "the dynamic analysis described by the Commission is at the heart of antitrust analysis; it is central to the concept of market definition. The dynamic analysis hinges on the adducing of evidence of elasticity of demand and barriers to entry. In the absence of such evidence, it is simply not possible to infer whether a service area constitutes a geo-

graphic market for antitrust purposes." *Steuer & Latham,* 672 F.Supp. at 1511.

Plaintiff's assertion that the relevant geographic market is Indiana County, or the central portion thereof, is based on the following data supplied by the Indiana Hospital PA Certificate of Need Application Proposal for Computerized Tomographic Whole Body Scanner (December, 1982):

Based upon admission data, Indiana Hospital's primary service area consists of 54,-551 residents or 59% of Indiana County's population. The communities . . . provided 75.3% of Indiana Hospital's discharges. . . . [Outlying portions] of Indiana County accounts for 14.6% of Indiana Hospital's discharges. Other Pennsylvania counties and Out-of-State admissions account for the remaining 10.1%.

*   *   *   *   *   *

Indiana Hospital's Primary Service Area consists of ten (10) townships and/or boroughs within a five (5) mile radius to the West to a fifteen (15) mile radius on the Northeast from Indiana Borough. . . .

The Relevance Index and Relative Market Share Index are indices which may be used to evaluate Indiana Hospital's strategic position within the health care market.

Relevance Index:

Persons in Primary Service
Area discharged from Indiana Hospital

Total Indiana County Discharges

The Relevance Index assesses the relationship between Indiana Hospital's discharges within Indiana Hospital's Primary Service Area and all Indiana County discharges from all other hospitals. Indiana Hospital's Relevance Index is 55.2%.

Relative market share:

Number of patients in the Primary
Service Area discharged from
Indiana Hospital

Number of patients in the Primary
Service Area discharged from all Hospitals

Indiana Hospital's relative market share for its primary service area is 82.8%. 1,501 patients residing within Indiana Hospital's Primary Service Area sought care from hospitals other than Indiana Hospital. Indiana Hospital's Relative Market Share for its Primary and Secondary service area is 66%. 4,441 Indiana County residents who sought acute care, sought services from hospitals other than Indiana County. Outmigration for Indiana County, as a whole, is 34%. Outmigration for Indiana Hospital's primary service area is 17.2%.

(Certificate of Need, at 7–10). The data contained in the Certificate of Need and plaintiff's definition of relevant geographic market refers solely to the Hospital's service area. In *Steuer & Latham,* the Court found that a county is not the relevant geographic market in a single hospital county merely based on the hospital's service area. "In order to convert a 'service area' into a geographic market, it is necessary to offer evidence regarding elasticity of demand and barriers to entry. Absent such evidence, which plaintiffs have the burden of introducing, there is no basis for inferring that a service area constitutes a geographic market, or that the patient origin data pertinent to that service area constitute 'market share' information." *Steuer & Latham,* 672 F.Supp. at 1511. In order to allow a jury to make a finding as to the Hospital's percentage of *market share,* plaintiff must first provide the Court with expert testimony that the service area does, in fact, constitute an antitrust market. *Id.* at 1511–12, n. 25. Plaintiff has not presented the Court with any evidence which could lead a jury to determine whether the above-cited statistics constitute a market share.

Although plaintiff has presented no expert testimony to support his version of the relevant geographic market,[5] defendants have

---

**5.** Plaintiff did submit a report by Dr. Ronald E. Gots, M.D., Ph.D., which plaintiff asserts was intended to give expert testimony on the relevant geographic market. In his report, Dr. Gots states that he had been specifically asked to determine in his best judgment whether plain-

tiff's loss of Hospital privileges was based upon criteria generally required and customarily utilized in revoking physician privileges, and to determine whether the documents provided and available suggest non-medical, economic motivations for the Hospital's adverse action taken

submitted the expert report of Edwin F. Ellis, Jr., CPA, who states that the relevant geographic market is five counties encompassing nine hospitals and that defendants' market share in this relevant market ranged from 10.6 percent to 11.3 percent. According to a 1977 feasibility study for Indiana Hospital (Ellis affidavit, Exhibit F), and a patient destination report of Indiana County residents for calendar year 1984 (Ellis affidavit, Exhibit G), 40 percent of the residents of Indiana County who were hospitalized during the time periods covered by these reports utilized hospitals other than Indiana Hospital, i.e., hospitals outside Indiana County. Ellis concludes that the Hospital's primary service area is not a relevant geographic market for antitrust purposes because "residents of Indiana County can and do readily obtain hospital services at hospitals other than Indiana Hospital (i.e., hospitals *outside* Indiana County)." (Ellis affidavit at 6). In addition, according to a report prepared by Hamilton Associates (Ellis affidavit, Exhibit E), there are seven hospitals within 25 to 30 miles of Indiana Hospital, and one hospital within 35 miles of Indiana Hospital. This evidence of market share is far from sufficient to establish the market power necessary to significantly restrain trade. *Oksanen,* 945 F.2d at 709. *See Robinson v. Magovern,* 521 F.Supp. 842, 887 (W.D.Pa.1981), *aff'd,* 688 F.2d 824 (3d Cir.), *cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982); *United States v. Aluminum Company of America,* 148 F.2d 416 (2d Cir.1945).

Plaintiff asserts that the Certificate of Need itself is sufficient evidence of the relevant geographic market. The Certificate states that "[i]t should be noted that geographic accessibility to these other facilities is less than desirable, particularly during inclement weather, due to the mountainous terrain and poor road conditions." (Certificate of Need at 5). In addition, in a 1976 Program for Development, the Hospital made the following statement:

Indiana Hospital is the only hospital in Indiana County. It has virtually no competition from other hospitals in the area. Therefore, it must be responsive to the health care needs of (1) the county, and (2) the specialized needs of people living particularly in contiguous counties to the north and east. The hospital must be prepared to function as a coordinator for providing new and expanded health services for its Service Area. It must be prepared to provide either directly or indirectly: emergency care, general acute care, long term care, home care and ambulatory care.

(Program for Development at 3). Plaintiff attempts to utilize these statements as evidence that Indiana County is the relevant geographic market. Plaintiff's contention ignores the fact that (1) statements regarding geographic accessibility to other facilities is merely one factor in determining the relevant geographic market, but that more extensive testimony, i.e. expert testimony, is needed to tie geographic accessibility to other factors, *Steuer & Latham,* 672 F.Supp. at 1512 n. 25 (*citing Military Services Realty,* 823 F.2d at 829; *Forro Precision, Inc. v. IBM,* 673 F.2d 1045, 1058–59 (9th Cir.1982)); (2) what the Hospital itself perceives to be its competition is irrelevant to the question of whether in fact there existed competition, which requires expert testimony, *id.;* and (3) taken in context, it is clear that this statement relates to the Primary Service Area, an area that has been held to be insufficient in itself to establish a relevant market. *Steuer & Latham,* 672 F.Supp. at 1511.

### C. The need to show significant injury to competition

The focus of antitrust law is on promoting competition, not on protecting competitors. *Brunswick Corp. v. Pueblo–Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *National Collegiate Athletic Association v. Board of Regents,* 468 U.S. 85, 103, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984). As stated in *Oksanen:*

---

against plaintiff. He does not comment on the relevant geographic market, nor would he be so qualified. Thus, this report does not raise a genuine issue of material fact. Although plaintiff attempted to introduce the expert report of Dr. Klepper on the relevant geographic market, this Court, per Order dated February 19, 1992, ruled that such evidence would not be accepted.

As a result, a plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic injury. For example, the fact that a hospital's decision caused a disappointed physician to practice medicine elsewhere does not of itself constitute an antitrust injury. [*Hyde*, 466 U.S. at 31, 104 S.Ct. at 1568.] If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action. To keep the antitrust laws from becoming so trivialized, the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 [110 S.Ct. 1884, 109 L.Ed.2d 333] (1990).

*Oksanen*, 945 F.2d at 708. *See Nanavati*, 857 F.2d at 121, n. 24.

Even if plaintiff did submit evidence of a restraint on competition in a relevant market, he must go on to prove that the restraint is "substantially adverse." *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 375, 87 S.Ct. 1856, 1863, 18 L.Ed.2d 1249 (1967). "Practices that produce only an 'insignificant,' 'de minimis,' 'trivial,' or 'insubstantial' restriction of competition are not unlawful." *Steuer & Latham*, 672 F.Supp. at 1504. *See United States v. Topco Associates, Inc.*, 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). As discussed in *Tunis II*, "[t]he Sherman Act was designed to prohibit significant restraint of trade rather than to 'proscribe all unseemly business practices;' [*Sitkin Smelting and Ref. Co. v. FMC Corp.*, 575 F.2d 440, 448 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978)]; *see Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 n. 15, 60 S.Ct. 982, 992 n. 15, 84 L.Ed. 1311 (1940); and the plaintiff[ ] must have demonstrated some harm to the competitive landscape" as a result of Indiana Hospital's termination of plaintiff's staff privileges. *Tunis II*, 952 F.2d at 728.

The analysis of whether there was a substantial effect on competition requires that the plaintiff put forth at least some evidence of the impact of the exclusion on the market so that a jury would not be forced to speculate as to what the injury might have been. In this case, plaintiff did not present any evidence of adverse effects, apart from the adverse affects to his own practice. In order to show a substantial effect on competition, it is necessary to show that there was either (1) a rise in the price of medical services above a competitive level, (2) a decrease in the supply of doctors in the relevant market, or (3) a decrease in the quality of medical services provided. *Id.* at 29. *See also Nanavati*, 857 F.2d at 121 n. 24. Plaintiff's "anecdotal information" that there has been some increase in price charged for the relevant services as a result of termination of his staff privileges (Miller depo. at 477–78, 480) is far from sufficient to aid a jury in determining the extent of any adverse affects on competition. As to the requirement of showing a decrease in the supply of doctors in the relevant market, plaintiff has presented no evidence tending to show that physicians in the relevant product and geographic market have decreased as a result of defendants' actions.[6] Further, this is not a case where a representative of a class of competitors is being excluded from the market. *Cf. Weiss* (attempt to exclude osteopaths); *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440 (9th Cir.1988) (attempt to exclude nurse anesthetists); *Cooper v. Forsyth County Hosp. Auth.*, 789 F.2d 278 (4th Cir.1986) (attempt to exclude podiatrists). Lastly, there has been no evidence submitted that there has been a decrease in the quality of medical services provided as a result of the termination of plaintiff's staff privileges. Absent such a showing of a rise in price, a decrease in the supply of doctors in the relevant market, or a decrease in the quality of care in the relevant market, there can be no significant effect on competition.

6. Although plaintiff points out that there was a decrease in supply of urologists for a short period of time following termination of his staff privileges, in fact, consumers' choice of urologists increased after 1979. (*See* defendants' answers to interrogatories, Dec. 4, 1991). Furthermore, plaintiff has at no time alleged that the relevant product market is urological services.

The Court agrees with the *Oksanen* Court, which followed Third Circuit reasoning on this issue as follows:

> The peer review process, by policing the competence and conduct of doctors, can enhance competition. "By restricting staff privileges to doctors who have achieved a predetermined level of medical competence, a hospital will enhance its reputation and the quality of care that it delivers." *Weiss,* 745 F.2d at 821 n. 60. Similarly, the friction created between a hospital and a doctor with a legacy of trouble in interpersonal relationships can decrease efficiency, discourage other qualified doctors from joining the staff, and detract from a hospital's ability to provide quality patient service.

> In sum, the anti-competitive effects are by no means so clear and one-sided as Oksanen would have them, and the revocation of Oksanen's staff privileges, while undoubtedly impacting adversely on his practice, has not been shown to have had any adverse impact on competition in the relevant market.

*Oksanen,* 945 F.2d at 709.

Accordingly, since plaintiff has not introduced evidence of market power and has not shown a substantial harm to competition, the Court will grant defendants' motion for summary judgment with respect to plaintiff's Section 1 claim.

## IV. Section 2

■ Section 2 reads in pertinent part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor....

15 U.S.C. § 2 (1982). The test for determining whether a defendant has monopolized in violation of Section 2 has been articulated by the Supreme Court as: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic acci-

dent." *Weiss,* 745 F.2d at 825 (*quoting Grinnell,* 384 U.S. at 570–71, 86 S.Ct. at 1703–04). "A defendant possesses monopoly power if it has the ability to change the competitive variables of a product to the disadvantage of consumers without causing effective competitors to enter the relevant market." *Magovern,* 521 F.Supp. at 886. In the absence of evidence demonstrating the relevant geographic market or facts demonstrating defendants' ability to exert market dominance in that market, it would be impossible for plaintiff to establish that defendants formed a monopoly to prevent him from operating his trade. *Brown,* 767 F.Supp. at 631–32. Accordingly, defendants' motion for summary judgment as to plaintiff's claim pursuant to Section 2 shall be granted.

An appropriate Order will be issued.

### JUDGMENT ORDER

AND NOW, this 9th day of March, 1992, upon consideration of Defendants' Motion for Summary Judgment filed in the above captioned matter on December 11, 1991, and for the reasons set forth in this Court's Memorandum Opinion filed herewith,

IT IS HEREBY ORDERED that said Motion is GRANTED. IT IS FURTHER ORDERED that judgment be, and hereby is, entered in favor of defendants and against plaintiff.